[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-12956

_____

D.C. Docket No. 1:11-cr-20678-KMM-5

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

TREVOR RANSFER,
KENDRICK LOWE,
ERIC HANNA,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(January 28, 2014)

Before MARTIN and JORDAN, Circuit Judges, and BAYLSON,[*] District Judge.

BAYLSON, District Judge:

## I.    INTRODUCTION

_____

[*] Honorable Michael M. Baylson, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

A jury convicted the three Appellants in this appeal, Trevor Ransfer, Eric Hanna, and Kendrick Lowe, of sixteen counts of Hobbs Act robbery, conspiracy, and use and carrying of firearms during the commission of a violent crime. They appeal from their convictions and sentences.

Appellants raise three principal issues on appeal. First, Appellants challenge the admission of evidence resulting from the installation and use of a GPS tracking device without a warrant to determine the location of a Ford Expedition that was used in the commission of several robberies. Defendants contend this was an unconstitutional search in light of the Supreme Court's holding in United States v. Jones, __ US __, 132 S. Ct. 945, 949, 181 L. Ed. 2d 911 (2012), that the installation and use of a GPS tracking device is a search under the Fourth Amendment

Second, Appellants challenge the admission of testimony by Sergeant Villaverde as hearsay, and the denial of their motion to suppress their post-arrest statements to police, contending the confessions were involuntary and coerced.

Third, Appellant Lowe argues there was insufficient evidence to convict him on all charges, and contends his expert witness was improperly excluded.

We hold that the good faith reliance exception to the exclusionary rule under Davis v. United States, __ US __, 131 S. Ct. 2419, 2423-24, 180 L. Ed. 2d 285 (2011) applies to this case, because the officers' conduct comported with clear,

2

binding precedent that pre-dated the Jones opinion.  Accordingly, we affirm the District Court's denial of Appellants' motion to suppress. For the reasons discussed below, the District Court did not abuse its discretion in any of its evidentiary rulings.  Finally, we find a reasonable trier of fact could find Lowe guilty of conspiracy to commit Hobbs Act robbery, and the charges related to the Farm Store, Hialeah CVS and Wendy's armed robberies.  Because there was no evidence Lowe took any action in furtherance of the Kendall CVS robbery, we vacate his conviction on those counts, and remand for sentencing.

## II.    FACTUAL BACKGROUND

Six defendants were indicted on sixteen counts of Hobbs Act robbery, conspiracy, and use and carrying of firearms during the commission of a violent crime. DE 3.  Between April 2011 and June 2011 Appellants Kendrick Lowe, Trevor Ransfer, Eric Hanna and co-conspirators Robert Davis,[1] Montavis Middleton,[2] and Fabian Warren[3] ("the crew")[4] engaged in a series of robberies of businesses in Florida, including the robbery of a Doral Ale House on April 25, a Farm Store in Sweetwater at 10:40 p.m. on May 11, a CVS store in Hialeah at 3

---

[1] The District Court granted Davis's motion to sever, so he was not tried with Appellants Lowe, Ransfer and Hanna. DE 97.
[2] Middleton pled guilty to the charges. DE 92.
[3] Warren was not arrested until 2012, so he also did not stand trial with Appellants. DE 129.
[4] The group of six individuals was referred to by the prosecutor at trial as "the crew."

3

a.m. on May 15, a CVS store in Kendall at 3:30 a.m. on May 15, and a Wendy's at approximately 10 p.m. on June 1.

An informant led investigators to several of the robbery suspects. DE 99 at 10-11.  The investigation established the use of a vehicle in the robberies on which police attached a GPS tracking device. DE 278 at 579-80; DE 99 at 13-14.  Several defendants were arrested shortly after one of the robberies occurred and physical evidence of the robberies was found on them and in the vehicles they were driving. DE 276 at 283-84.

## A. Pre-Trial Suppression

1. Statements to Police

Appellants Ransfer, Hanna, and Lowe moved to suppress their post-arrest statements to police, arguing they were involuntary and coerced. DE 58, 59, 61. In brief, Ransfer and Hanna admitted their participation in all of the robberies charged, but Lowe only admitted his presence at the Farm Store, CVS Hialeah, and Wendy's at the time of the robberies. DE 66, 67. Magistrate Judge Edwin Torres held a three-day evidentiary hearing to consider the voluntariness of the Defendants' post-arrest statements to police. DE 99, 100, 110.

4

The Magistrate Judge found the statements were given voluntarily and did not find any credible evidence Defendants were coerced. DE 120 at 29.[5] The District Court adopted the Magistrate's Report and Recommendation. DE 165.

2. GPS

Ransfer and Hanna also moved to suppress any evidence obtained as a result of the GPS tracker used to locate the Ford Expedition used in some of the robberies. DE 184. At the suppression hearing, Sergeant Villaverde testified that police installed a GPS tracking device without a warrant on the Expedition on May 26, 2011. DE 99 at 13-14.  On May 27, 2011,  the police recorded a controlled call which an informant, Khambrel Bynum, made to Davis, and recorded Davis saying that the crew would be committing another robbery as soon as they stole another getaway vehicle. DE 99 at 12-13. On June 1, 2011, police received notice of another robbery matching the crew's modus operandi, and activated the GPS tracking device to locate the Expedition. DE 99 at 14-15.  Police determined the

---

[5] At the conclusion of the three-day suppression hearing, Magistrate Judge Torres found:
> The record evidence establishes that each Defendant was provided food, water and access to the restroom. The Defendants received Miranda instructions, indicated that they understood their rights and signed as many as two Miranda waivers each. The Defendants then provided recorded and un-recorded interviews to detectives, oftentimes with additional Miranda warnings, and voluntarily made various inculpatory and exculpatory statements. Thereafter, each Defendant, oftentimes more than once, acknowledged that their statements were made without coercion, threats, or improper promises. The Defendants present no competent evidence to the contrary.

DE120 at 29.

vehicle's location, and officers were sent to "the area [] where the Expedition was parked." DE 99 at 15.

In his Report and Recommendation, the Magistrate Judge found neither Defendant had a possessory interest in the Expedition or a reasonable expectation of privacy, because they were not in possession of the vehicle at the time the GPS was installed or used to locate the car. DE 203 at 11. Accordingly, neither Defendant had standing to challenge the search. DE 203 at 11. The District Court adopted the Report and Recommendation over Defendants' objections.  DE 217.

## B. Trial

At trial, Sergeant Villaverde testified that when Sergeant Echazabal, Detective Goble and Detective Thomas arrived at the location the GPS tracker identified, the Expedition was moving, followed by a white Toyota Solara that had been seen on surveillance video of some of the robberies. DE 364 at 84-85. Detective Goble testified at trial that police followed the vehicles into a gas station, and observed Hanna exit the Expedition, hide behind a tire, and throw a bundle of cash under the car. DE 364 at 164-65.  Sergeant Echazabal testified at trial he observed Ransfer in the driver's seat of the Expedition, and Ransfer exited the car when ordered. DE 364 at 179-81.  Sergeant Echazabal patted down Ransfer and recovered from his pants pocket cash and a debit card bearing the name of the Wendy's manager who was robbed earlier that evening. DE 365 at 181-82.

Davis's sister—not a defendant—was driving the Solara, and Middleton was in the passenger seat of the Solara. DE 277 at 331.  Officers found additional evidence of the robbery in the Solara, including clothing used in the robbery, additional cell phones, and a driver's license and other wallet items belonging to the same Wendy's manager. DE 276 at 283-84.  Ransfer, Hanna, and Middleton were arrested, the two vehicles were impounded and police obtained search warrants for both vehicles. DE 364 at 101, 152.

Sergeant Villaverde testified at trial that police then went to Davis's house, where they observed a blue minivan which had been seen at the Wendy's robbery—police later learned that this minivan had been stolen. DE 364 at 86-87. Detective Armenteros testified at trial that when he arrived at the Davis residence, he saw Davis and Lowe on the front porch of Davis's house and then observed the two men run inside the house.  DE 364 at 192.  Detective Armenteros testified that he and Detective Ramirez kicked down the front door.  DE 364 at 192-93. When they entered the house, they heard a back door slam shut.  DE 364 at 192-93.  They then kicked in the back door and found Davis and Lowe inside the back bedroom. DE 364 at 194.  Detective Armenteros testified that he struggled with Lowe, who, during the course of the arrest, was punched in the chest, pushed to the ground and punched again. DE 276 at 214-25; DE 276 at 213-14.  Detective Armenteros sustained a head injury during the struggle. DE 276 at 215-16.  Both Davis and

7

Lowe were arrested and taken to the police station for questioning.  DE 364 at 88.

Sergeant Villaverde and Detective Armenteros testified at trial that police found

additional evidence of the robberies at Davis's home, including firearms and the

wallet of a victim in the Wendy's robbery. DE 364 at 89; DE 364 at 192.  Police

also recovered the stolen blue minivan at the Davis residence.  DE 364 at 89.

Defendants were taken to the police station between 12 a.m. and 1 a.m. on

June 2 and held for approximately twenty-four hours as police from the relevant

jurisdictions questioned them about the robberies. DE 364 at 91.  There was

significant testimony both at trial and at the suppression hearing that Defendants

were regularly offered food and restroom breaks, and in their recorded statements,

Defendants said they were treated well. DE 364 at 92 (trial); DE 99 at 85, 142

(suppressing hearing).[6]  Ransfer, Lowe, and Hanna were advised of their Fifth

Amendment rights, signed Miranda waivers, and agreed to speak to the police

without an attorney. DE 278 at 604, Ex. 66 (Lowe); DE 277 at 580-81, Ex. 71

(Ransfer); DE 277 at 188-98, Ex. 72 (Hanna).  In these post-arrest statements to

police, Ransfer and Hanna admitted their involvement in the robberies. DE 278 at

586-87; DE 279 at 732-33.[7]  Lowe admitted his presence at the time and location

---

[6] Hanna testified at the suppression hearing that police made physical threats, but the Magistrate Judge did not find his testimony credible and found Hanna's testimony was substantially contradicted by the other evidence on the record. DE120 at 24-25.

[7] Transcripts of the recorded statements were provided to the jury and recordings of the statements were played at trial. These transcripts were redacted in accordance with Bruton v.

of three of the robberies, but not his complicity. DE 278 at 545-46; DE 278 at 613; DE 277 at 479.[8]

Defendants Ransfer, Hanna and Lowe were convicted on all counts after a three-day jury trial. DE 231. Defendants Ransfer and Hanna appeal their conviction based on the denial of their motion to suppress evidence flowing from the warrantless GPS search. Defendant Lowe challenges the sufficiency of the evidence to convict him on all counts charged. All three Defendants challenge the sufficiency of the evidence on the interstate commerce issue, admission of Sergeant Villaverde's testimony as hearsay, and the admission of their post-arrest statements as involuntary. Lowe also contends the District Court erred in excluding his medical expert as irrelevant and in limiting his closing argument to twenty minutes. Finally, Hanna challenges the testimony of the Metro PCS records custodian as expressing an expert opinion.

## III.    JURISDICTION & STANDARD OF REVIEW

"Because rulings on motions to suppress involve mixed questions of fact and law, we review the district court's factual findings for clear error, and its application of the law to the facts de novo. Further, when considering a ruling on a

---

United States, 391 U.S. 123, 128, 88 S. Ct. 1620, 1623, 20 L. Ed. 2d 476 (1968). See infra note 21.

[8] Lowe did not make any statement to police that he was at the CVS in Kendall when it was robbed. The transcript of Lowe's recorded statement to police was provided to the jury and portions of the statement were read at trial. DE 278 at 603.

9

motion to suppress, all facts are construed in the light most favorable to the prevailing party below." United States v. Bervaldi, 226 F.3d 1256, 1262 (11th Cir. 2000) (citation omitted).

Evidentiary rulings are reviewed for abuse of discretion. United States v. Range, 94 F.3d 614, 620 (11th Cir. 1996); United States v. Russell, 703 F.2d 1243, 1249 (11th Cir. 1983) ("Determinations of admissibility of evidence rest largely within the discretion of the trial judge and will not be disturbed on appeal absent a clear showing of an abuse of discretion."). We also review the amount of time allotted for closing argument for abuse of discretion. United States v. Carter, 760 F.2d 1568, 1581 (11th Cir. 1985).

Sufficiency of the evidence is reviewed de novo, considering the evidence in the light most favorable to the government, to determine whether a reasonable jury could find the defendant guilty beyond a reasonable doubt. United States v. Pedro, 999 F.2d 497, 500 (11th Cir. 1993).

## IV. DISCUSSION

### A. GPS Search

In United States v. Jones, the Supreme Court held that installing a GPS tracking device on a vehicle and tracking the vehicle's movement for 28 days was a search under the Fourth Amendment. 132 S. Ct. at 949 ("We hold that the Government's installation of a GPS device on a target's vehicle, and its use of that

device to monitor the vehicle's movements, constitutes a 'search.'").  In Jones the

GPS data was admitted into evidence to show the defendant was at the alleged co-

conspirator's stash house.  Id. at 948-49. The Court distinguished its earlier

precedent in United States v. Knotts, 460 U.S. 276, 282, 103 S. Ct. 1081, 1086, 75

L. Ed. 2d 55  (1983), holding that tracking a radio signal from a beeper placed in a

chemical container with the owner's consent before the defendant stole the

container was not an unconstitutional search because the defendant had no

reasonable expectation of privacy in his movements on public highways.  Id.

("Nothing in the Fourth Amendment prohibited the police from augmenting the

sensory faculties bestowed upon them at birth with such enhancement as science

and technology afforded them in this case.").

   In Jones the Supreme Court found Knotts only addressed the question of

reasonable expectation of privacy and did not address the question of trespass,

because the tracking device was initially installed on a chemical container that the

defendant placed in his car with permission of the company that owned the

container.  Jones, 132 S. Ct. at 952 ("Knotts would be relevant, perhaps, if the

Government were making the argument that what would otherwise be an

unconstitutional search is not such where it produces only public information.").

The Court explained that the GPS tracking was a search because "[t]he

11

Government physically occupied private property for the purpose of obtaining information." Id. at 949.

## 1. Good faith reliance on precedent

In Davis v. United States, which was on appeal from this court, the Supreme Court held "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." 131 S. Ct. 2419, 2423-24 (2011). In Davis the police searched the passenger compartment of a defendant's car after he had been handcuffed and all the occupants had been secured. United States v. Davis, 598 F.3d 1259, 1261 (11th Cir. 2010). The Eleventh Circuit refused "to apply the exclusionary rule when the police have reasonably relied on clear and well-settled precedent." Id. at 1266. ("We stress, however, that our precedent on a given point must be unequivocal before we will suspend the exclusionary rule's operation."). The Supreme Court agreed the police could rely on this precedent because "we had not yet decided Arizona v. Gant, 556 U.S. 332, [351 (2009)], and the Eleventh Circuit had interpreted our decision in New York v. Belton, 453 U.S. 454, 460 (1981) to establish a bright-line rule authorizing the search of a vehicle's passenger compartment incident to a recent occupant's arrest. . . . [and t]he search incident to Davis's arrest in this case followed the Eleventh Circuit's Gonzalez precedent to the letter." Davis, 131 S. Ct. at 2428.

12

Prior to Jones, this court held that installation of a beeper on a vehicle parked in a public place and tracking of the vehicle's movements on public roads did not violate the Fourth Amendment when officers had reasonable suspicion to initiate surveillance of the vehicle.[9] United States v. Michael, 645 F.2d 252, 258 (5th Cir. 1981) ("Monitoring the beeper while the agents had reasonable suspicion to believe Michael was conspiring to manufacture MDA did not violate his fourth amendment rights.").[10] After the police in Michael were alerted by chemical supply companies that the defendant purchased large quantities of equipment and chemicals used to manufacture MDA, the police installed an electronic tracking beeper to the outside of the defendant's van when it was parked in a public parking lot. Id. at 255. The police used the beeper to track the defendant to a warehouse filled with "chemicals, equipment and large quantities of MDA." Id.

The court in Michael held that "installation of the beeper was permissible even if we assume the installation was a search," because "the minimal intrusion involved in the attachment of a beeper to Michael's van, parked in a public place,

---

[9] During the pendency of this appeal, the Eleventh Circuit held police acted in good faith reliance on Michael when they placed a GPS tracking device on two of the defendant's vehicles when they were parked in public parking lots.
United States v. Smith, __ F.3d __, No. 1211042 at *19 (slip op) (11th Cir. Dec. 23, 2013) ("To any reasonable officer, then, the three prongs of Michael's Fourth Amendment analysis dictated the constitutionality of the search here at issue. In short, the agents relied reasonably on what was then binding appellate precedent.").
[10] See Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (holding Fifth Circuit precedent prior to the creation of the Eleventh Circuit in October 1981 is considered binding precedent on the Eleventh Circuit).

13

was sufficiently justified so as to satisfy any of Michael's Fourth Amendment expectation of privacy concerns." Id. at 256.

The Fifth Circuit recently held police could rely on Michael "[d]espite any possible technological differences between a 1981 'beeper' and the GPS device used in this case, [because] the functionality is sufficiently similar that the agents' reliance on Michael to install a GPS device on the truck, in light of the reasonable suspicion of drug trafficking, was objectively reasonable." United States v. Andres, 703 F.3d 828, 835 (5th Cir. 2013) cert. denied, 133 S. Ct. 2814 (2013). We agree with the Fifth Circuit that Michael was clear, binding precedent that holds the electronic tracking of a vehicle without a warrant does not violate the Fourth Amendment, particularly where officers had reasonable suspicion the vehicle was involved in criminal activity.

In this case, the police had a reliable informant, Khambrel Bynum, who provided substantial details on the previous robberies and the Defendants' use of the Expedition in those robberies. DE 99 at 8-9; DE 364 at 77-78. Police recorded a conversation between Bynum and Davis about a planned upcoming robbery. DE 99 at 12-13. Police also observed the Expedition on surveillance footage from the scene of other robberies. DE 99 at 91. The GPS tracker was installed when the

Expedition was in a public place and was used to locate the Expedition when it was in a public parking lot. DE 99 at 15.[11]

The First Circuit recently applied Davis to find that a warrantless GPS search was admissible in United States v. Sparks, 711 F.3d 58, 62 (1st Cir. 2013). As in this case, the officers in Sparks attached a GPS tracking device to a car used by a suspect in a number of robberies. Id. at 60. Using the GPS data, the officers tracked the car for eleven days, eventually to the scene of a crime. Id. The First Circuit held the Davis exception applied because "[w]hen the police comply with authoritative precedent, only to see the law evolve after the fact, there is nothing to deter; the police cannot modify their conduct to accord with cases not yet decided." Id. at 63 (citing Davis, 131 S. Ct. at 2428-29).

> The court in Sparks found that the Supreme Court precedent in Knotts
>
> was widely and reasonably understood to stand for the proposition that the Fourth Amendment simply was not implicated by electronic surveillance of public automotive movements, because the latter was merely a more efficient "substitute . . . for an activity, namely following a car on a public street, that is unequivocally not a search within the meaning of the amendment."

Id. at 67 (quoting United States v. Garcia, 474 F.3d 994, 996–97 (7th Cir. 2007)). First Circuit precedent in United States v. Moore held the trespass issue to be "so insignificant as to be essentially irrelevant for Fourth Amendment purposes." Id. at

---

[11] Moreover, the GPS tracking data was not used to generate evidence of criminal activity, as it was impermissibly used in Jones. Rather, it was used to locate Defendants immediately after officers suspected the same crew committed another robbery. DE364 at 81.

15

65 (citing United States v. Moore, 562 F.2d 106, 111 (1st Cir. 1977) ("[W]e do not find it critical that the beeper placed in the package of chemicals was inserted before title to the chemicals passed to defendants, while the beepers affixed directly to the vehicles were attached without the owners' permission and hence involved a trespass.")). Sparks held that because the officers reasonably relied on clear binding precedent in Knotts and Moore, evidence resulting from the warrantless use of the GPS tracking device was admissible under the good faith reliance exception. Sparks, 711 F.3d at 67 ("In sum: at the time of the GPS surveillance in this case, settled, binding precedent in the form of Knotts and Moore authorized the agents' conduct.").[12]

Similarly, the Ninth Circuit held that evidence resulting from the GPS tracking of a defendant's vehicle that occurred prior to Jones was admissible under the Davis exception. United States v. Pineda-Moreno, 688 F.3d 1087, 1090-91 (9th Cir. 2012) cert. denied, 133 S. Ct. 994 (2013) (finding Ninth Circuit previously held in United States v. McIver, 186 F.3d 1119, 1126–27 (9th Cir. 1999), that placing an electronic tracking device on a car was "neither a search nor a seizure under the Fourth Amendment"). "Whatever the effect of Jones, then, the

---

[12] Recently, the Second Circuit agreed with Sparks, finding it was objectively reasonable for police to rely on Knotts and Karo when they placed a GPS tracking device on the defendant's car without a warrant. United States v. Aguiar, 737 F.3d 251, 261-62 (2d Cir. 2013) ("Moreover, we find the beeper technology used in Knotts sufficiently similar to the GPS technology deployed by the government here.").

critical evidence here is not subject to the exclusionary rule." Id. at 1091 (citing

Davis, 131 S.Ct. at 2423-24).

However, the Third Circuit recently found no good faith reliance exception

for a warrantless GPS search because there was no clear, binding precedent in the

Third Circuit, United States v. Katzin, 732 F.3d 187, 206-8

(3d Cir. 2013) (noting the Fifth, Seventh, Eighth, and Ninth circuits held the

warrantless use of a GPS tracking device was not unconstitutional, but the D.C.

Circuit did find it violated the Fourth Amendment).[13] Judge Van Antwerpen

concurred that Jones requires a warrant before installing a GPS tracking device but

dissented on the good faith reliance exception.  Katzin,  2013 WL 5716367, at *2

(Van Antwerpen, J., concurring in part and dissenting in part) ("Given pre-Jones

Supreme Court precedent, the consensus regarding GPS and GPS-like use across

the federal courts, and other relevant considerations, I would hold that the law

enforcement officers here acted—with an objectively-reasonable good-faith belief

'that their conduct [was] lawful.'" (quoting Davis, 131 S. Ct. at 2427)).  The Third

Circuit did not find Knotts to be clear precedent because of "(1) the lack of a

physical intrusion . . . , (2) the placement by police of the beepers inside

containers, and (3) the marked technological differences between beepers and GPS

trackers."  Id. at *38. The Third Circuit held beepers are different because beepers

---

[13] The Third Circuit has granted a petition to rehear this case en banc.  Oral arguments are scheduled for May 28, 2014.

only broadcast a signal and are range-limited. Id. at *6. But see United States v. Andres, 703 F.3d 828, 835 (5th Cir. 2013) cert. denied, 133 S. Ct. 2814 (2013) (rejecting any distinction between electronic beepers and GPS for Fourth Amendment purposes).

As discussed above, in the Eleventh Circuit, we do have clear precedent, Michael, 645 F.2d at 258, holding it did not violate the Fourth Amendment to install an electronic tracking device on the outside of a vehicle without a warrant, which is the same kind of intrusion at issue in this case. Moreover, the technological distinctions the Third Circuit found relevant in Katzin do not apply to the facts of this case: "Unlike GPS trackers, beepers require that the police expend resources – time and manpower – to physically follow a target vehicle." Katzin, 2013 WL 5716367 at *6. That is exactly what occurred in this case. As noted, the GPS tracker was not used to trace the movements of Defendants. The tracking device was not used until after an armed robbery was committed and the vehicle was used to flee the scene. Then the GPS tracking device was used for a very brief period of time after the robbery to pinpoint the location of the vehicle and to dispatch police to arrest Defendants several minutes after the Wendy's armed robbery.[14]

---

[14] It is also notable that the evidence suppressed in Katzin was found inside the vehicle, whereas evidence of the Wendy's robbery was found on Ransfer's person when he exited the Expedition, as well as inside the Expedition. DE 364 at 180; DE 276 at 293.

Michael articulated clear, binding precedent that installation of a device permitting electronic surveillance of a vehicle does not violate the Fourth Amendment when the police have reasonable suspicion. Michael, 645 F.2d at 257 (holding "that reasonable suspicion is adequate to support warrantless beeper installation"). There is no doubt of reasonable suspicion in this case based on the thorough police investigation detailed by Sergeant Villaverde and the other officers. Accordingly, it was reasonable for the police to rely on this long-standing, clear precedent when they attached the GPS to the Ford Expedition without a warrant.[15]

## B. Sergeant Villaverde's Testimony

Appellants contend that Sergeant Villaverde's testimony should have been excluded as hearsay. Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Fed.R.Evid. 801(c). Statements can be hearsay "even though they do not explicitly paraphrase the words of others, [because] the only conceivable explanation for how [the witness] discovered this information is through listening to the statements of others." United States v. Baker, 432 F.3d 1189, 1206 (11th Cir. 2005) (citing United States v. Shiver, 414 F.2d 461, 463 (5th

---

[15] Although the Third Circuit found the good faith reliance exception did not apply in Katzin, there was no such clear precedent in the Third Circuit on which the police could rely. 2013 WL 5716367, at *37.

Cir. 1969) (finding the contents of a police report were hearsay because the officers did not have first-hand knowledge of the details in the report)). "Statements by out of court witnesses to law enforcement officials may be admitted as non-hearsay if they are relevant to explain the course of the officials' subsequent investigative actions, and the probative value of the evidence's non-hearsay purpose is not substantially outweighed by the danger of unfair prejudice caused by the impermissible hearsay use of the statement." Id. at 1208 n.17; United States v. Jiminez, 564 F.3d 1280, 1287 (11th Cir. 2009) (quoting Baker as "the law [that] this Circuit has long recognized").

> In Jiminez,
>
> Detective Wharton testified that he had spoken to Jisklif and that Jisklif had told him that Jisklif's "brother, Jesus, was living with him and that he was helping him with the marijuana plants." Finally, the detective said "[t]hat's why we went back and interviewed [the defendant] a second time, because, after the first time, we took him at his word, until his brother indicated otherwise, and then we went back and asked him again."

564 F.3d at 1287 (affirming the conviction). The Eleventh Circuit found this statement was not hearsay because it was  relevant to explain why the detective re-interviewed the witness, so the statement "was admitted only to show what was said, not that it was true." Id. This explanation was relevant because the defense elicited testimony that suggested the re-interviewing of the witness was improper, so this statement was admitted to rehabilitate the detective's credibility. Id. at

20

1287 ("It is the existence of the statement, not its veracity, that provides the explanation."). But in Baker a similar statement that an officer "'received information' from an anonymous caller that indicated [defendants] . . . were involved in the shooting" was not relevant to explain the course of the investigation because

> Capote's investigation was not a complex endeavor; he responded to a homicide call, examined the scene of the crime, and interviewed witnesses. Nothing the witnesses said shed any additional light on why Capote conducted his investigation in the manner that he did, nor did Capote's investigation turn up any evidence other than eyewitnesses' statements accusing Williams and Casado of committing the homicides. Rather, the only relevancy of the witnesses' statements was to establish that Williams, Casado, and Rogers did in fact commit the homicides.

Baker, 432 F.3d at 1208-9.[16]

In this case Appellants challenge the following testimony by Sergeant Villaverde:

> We were able to identify Robert Davis, Montavis Middleton and Fabian Warren on the—beginning of intelligence.  We were then able to identify Eric Hanna . . . We were able to identify a picture of [Lowe] via a Facebook account as well as I had a surveillance still photo of him on May of 2011 at the CVS in Hialeah, which matched the Facebook photo, and the intelligence that we had received was that they would go in and scout the location. . . . The intelligence that we had received, they would go in and scout, just walk in and check out the place and then the store would be hit.

---

[16] Although the court held this was in error, the court did not overturn the Defendant's conviction because the statements were "independently corroborated by admissible evidence" and "the cumulative effect of the district court's errors was harmless given the avalanche of admissible, inculpatory evidence admitted against Williams at trial with respect to every count for which he was indicted."  Baker, 432 F.3d at 1224-25.

21

DE 364 at 73-74.

> We had a group of robberies that were occurring, that individuals were wearing gray sweatshirts or blue sweatshirts that had a certain name, Aero, red sweatpants. The height, weight, physical description matched. There was locations that were being targeted, that also matched other robberies that were occurring, and we ended up getting some more intelligence on that.

DE 364 at 72.

> We had got [sic] information that they had actually procured a vehicle. . . . They had gotten a vehicle that they were going to do another robbery with. However, during that conversation the victim— the subject advised that the victim had actually stole [sic] the car back from the location that the car was being held at, that they were going to use it to do a robbery.

DE 364 at 80.  Sergeant Villaverde  further testified: "We were able to identify a white Expedition that was being used in these crimes as well as a particular car that was also being used in these crimes.  They would steal minivans and use minivans during the commission of these robberies." DE 364 at 7-78.

Appellants contend these statements should have been excluded as hearsay because, as in <u>Baker</u>, the information was learned from a second person's out of court statements.[17]  The Government argues that this

---

[17] Timely hearsay objections were made to all of these statements at trial.  DE 364 at 72-80.  But no objection was made on Confrontation Clause grounds, although Hanna raises that issue on appeal.  Because there was not a timely Sixth Amendment objection, we review that challenge for plain error.  <u>Jiminez</u>, 564 F.3d at 1286.  The Supreme Court explained that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the

testimony was not offered for the truth of the assertions but instead was offered to explain how the investigation proceeded, as in Jiminez.

Sergeant Villaverde's testimony described the course of a complex investigation. Unlike the investigation in Baker, where the sergeant merely responded to the scene of a crime and interviewed witnesses, Sergeant Villaverde supervised a months-long endeavor to identify and locate multiple perpetrators who engaged in a series of armed robberies and car thefts. Sergeant Villaverde's testimony about the pattern of the crimes explains why the police believed the Wendy's was robbed by the same perpetrators as the Doral Ale House, Farm Store, and CVS. The statements regarding the identities of the Defendants and the description of the vehicles explain why the police installed a GPS device on Middleton's car and why the police went to Davis's house after they arrested Ransfer, Hanna, and Middleton. But unlike Jiminez, the explanation was not offered to rehabilitate the witness after impeachment. Instead, Sergeant Villaverde was the Government's first witness, who provided a summary of the investigation and also "shed [] additional light on why [Sergeant Villaverde]

---

truth of the matter asserted." Crawford v. Washington, 541 U.S. 36, 59 n.9, 124 S. Ct. 1354, 1369 n.9, 158 L. Ed. 2d 177 n.9 (2004). As explained infra, Sergeant Villaverde's statements were not admitted for the truth of the assertion, but to explain the next steps taken in the course of the investigation. Accordingly, we do not find plain error in their admission.

23

conducted his investigation in the manner that he did," Baker, 432 F.3d at 1208.[18]

We need not decide whether it was error for the District Court to admit all of Sergeant Villaverde's testimony.  Even if it was in error to admit the statements, as Appellants contend, it was not a reversible error because the evidence about which Sergeant Villaverde testified was otherwise admissible on the record.  "'To require a new trial . . . [a] significant possibility must exist that, considering the other evidence presented by both the prosecution and the defense, the . . . statement had a substantial impact upon the verdict of the jury.'" United States v. Arbolaez, 450 F.3d 1283, 1290 (11th Cir. 2006) (quoting United States v. Rodriguez, 524 F.2d 485, 487 (5th Cir. 1975)).  In Rodriguez, the court found admission of an officer's testimony reciting an informant's statements was not a reversible error because other evidence and testimony provided the same content as the inadmissible hearsay.  Rodriguez, 524 F.2d at 487 ("Thus, although the

---

[18] Although Appellants did not raise this issue in their briefs, we note that other circuits have raised serious concerns with overview witnesses, particularly when presented at the beginning of trial before the evidence summarized has been presented. United States v. Garcia, 413 F.3d 201, 214 (2d Cir. 2005) ("[I]t is generally viewed as 'improper . . . for a party to open its case with an overview witness who summarizes evidence that has not yet been presented to the jury.'" (quoting 6 Weinstein's Federal Evidence § 1006.04[3])); United States v. Griffin, 324 F.3d 330, 349 (5th Cir. 2003) ("We unequivocally condemn this practice as a tool employed by the government to paint a picture of guilt before the evidence has been introduced."); United States v. Casas, 356 F.3d 104, 119 (1st Cir. 2004) ("[I]nitial witness 'overview testimony' is inherently problematic: such testimony raises the very real specter that the jury verdict could be influenced by statements of fact or credibility assessments in the overview but not in evidence.").

24

admission of Agent Lawrence's testimony giving the specifics of the informant's tip constituted error, we find little possibility, in light of the other evidence, that the statement had a 'substantial impact' on the verdict of the jury."); see also Arbolaez, 450 F.3d at 1291 ("[W]e find it unlikely that the admission of Perez's statements had a substantial influence on the jury's verdict as to either count upon which he was convicted. Accordingly, although the court erred in admitting the statements, the error was harmless and so does not merit reversal.").

The following chart illustrates that for every objection Appellants made to Sergeant Villaverde's statements, the record shows first-hand, non-hearsay evidence.

| Sergeant Villaverde Statement | Other evidence on the record |
|---|---|
| "We had a group of robberies that were occurring, that individuals were wearing gray sweatshirts or blue sweatshirts that had a certain name, Aero, red sweatpants. The height, weight, physical description matched. There was [sic] locations that were being targeted, that also matched other robberies that were occurring, and we ended up getting some more intelligence on that." DE 364 at 72. | Police Be On the Look Out (BOLO) description of the robberies and photos from video surveillance. Gov't Ex. 69A; Gov't Ex. 69B. |
| "We were able to identify certain individuals in the crew robbery or the robbery crew. . . We were able to identify Robert Davis, Montavis Middleton and Fabian Warren on the -- beginning of intelligence. We were then able to identify Eric Hanna. Law enforcement was then aware of Mr. Ransfer and we were able to identify a picture of Mr -- Mr. Lowe. We were able to identify a picture of him via a Facebook account as well as I had a surveillance still photo | Hialeah CVS surveillance video. GX59. Still of Lowe from video. GX60A. Ransfer's recorded statement to police. DE 278 at 567-68. Hanna's recorded statement to police. DE 279 at 734-35. |

| | |
|---|---|
| of him in May of 2011 at the CVS in Hialeah, just before the robbery occurred, which matched the Facebook photo, and the intelligence that we had received was that they [the robbers] would go in and scout the location." DE 364 at 73-74. | |
| "The intelligence that we had received [from the informant], they [the robbers] would go in and scout, just walk in and check out the place and then the store would be hit." DE 364 at 74. | Recorded statements by Ransfer and Hanna to police. DE 278 at 569; DE 279 at 716. |
| "We were able to identify a white Expedition that was being used in these crimes as well as a particular car that was also being used in these crimes. They [the robbers] would steal minivans and use minivans during the commission of these robberies. . . . We also identified a vehicle at Mr. Davis's house that belonged to his sister, Ronisha Davis, a white Toyota car, Solara, two door." DE 364 at 77-78. | Farm Store surveillance video showing Expedition. Gov't Ex. 58. Recorded statements by Ransfer and Hanna to police about the blue minivan. DE 278 at 567; 279 at 731. Ransfer's recorded statement to police identifying the Expedition and Solara. DE 278 at 568; DE 278 at 589-3 at 7. Recorded statements by Lowe and Hanna identifying the Expedition used in the robberies. DE 279 at 714; DE 278 at 608, 612-13. |
| "We'd targeted an area that they [the robbers] were hitting as well as we had a source that was cooperating with us. [The informant] was getting information . . . [The informant] was getting information via telephone calls from one of the defendants, Mr. Davis, and we would get information from [the informant]." DE 364 at 79-80. | Sergeant Villaverde's first-hand knowledge about how the informant cooperated with police, and not the content of the information the informant provided to police. |
| "We had got [sic] information [from the informant] that they [the robbers] had actually procured a vehicle . . . They [the robbers] had gotten a vehicle that they were going to do another robbery with. However, during that [recorded] conversation [between the informant and Davis] the victim--the subject [Davis] advised that the victim had actually stole the car back from the location that the car was being held at, that they [the robbers] were going to use it to do a robbery." DE 364 at 80 | Text messages between Lowe and Davis about needing to get another getaway car read on the record. DE 279 at 795 Ransfer's recorded statement to police about a stolen van. DE 278 at 566-67. |

| | |
|---|---|
| "I learned of a blue minivan that was seen leaving the Wendy's robbery . . . During the course of learning that information, it was established that there was also a blue minivan Dodge that was stolen from down south at a location that was significant to myself." DE 364 at 82. | Ransfer's recorded statement to police that the Defendants stole a blue minivan DE 278 at 567-66; DE 278 at 70-71. |

In the recorded statements to the police that were played at trial, Ransfer and Hanna identified themselves, Davis, Middleton, Warren, and Lowe as individuals involved in the robberies. DE 278 at 567-68; DE 278 at 706-DE 279 at 714. Their statements also explained how the robbery crew first scouted out a location before robbing it. DE 279 at 716; DE 278 at 705.[19] The surveillance video showing Lowe at the Hialeah CVS, and still photos of Defendants from the surveillance video were admitted into evidence. In their recorded statements to the police that were played at trial, Ransfer and Hanna identified the Expedition and the Solara, as well as the stolen blue minivan. DE 278 at 566-68; DE 279 at 718; DE 279 at 722. Finally, the police Be On the Look Out (BOLO) description of the robberies was admitted as Exhibit 69B. Because the jury was presented with the content of all the statements elsewhere on the record, the jury would likely have reached the same verdict if Sergeant Villaverde's statements had been excluded. Accordingly, we do not find that the admission of Sergeant

---

[19] "When we first got there, we were watching to see what was going on, how many people there were, how many people were leaving, and we seen when we had our chance, we go to the back door and we jumped out." DE 278 at 705 (statement of Eric Hanna).

27

Villaverde's statements had a substantial impact in the jury verdict, and we find no reversible error. Arbolaez, 450 F.3d at 1291.

## C. Sufficiency of the Evidence as to Lowe

Defendant Kendrick Lowe was convicted of one count of conspiracy to commit Hobbs Act robbery under 18 U.S.C. § 1951, four counts of aiding and abetting Hobbs Act robbery, and four counts of possession of a firearm during the commission of a violent crime under 18 U.S.C. § 924. The Government's theory at trial was that Lowe was a lookout in the Farm Store robbery on May 11 at 10:40 p.m., the May 15 robberies of a CVS in Hialeah at 3:00 a.m. and a CVS in Kendall at 3:30 a.m.,[20] and the Wendy's robbery on June 1 at 10:00 p.m. based on his presence at each of the robbery locations at the time of the robberies, text messages he sent about obtaining a stolen vehicle for the Wendy's robbery, and his admissions to police that he was at three of the locations immediately before the robberies occurred and witnessed the armed robberies of the Farm Store and Wendy's.[21] The Government also pointed to contradictory statements Lowe gave to police, and argued, "[y]ou don't bring extra people to robberies." DE 280 at 938. Lowe argues the evidence does not show he participated in any of the robberies. Lowe also notes that he did not admit to being at the CVS Kendall, and the only

---

[20] The Government does not point to any evidence in its brief that Lowe aided and abetted the Kendall CVS armed robbery. Appellee's Br. at 45-46.

[21] All except the Kendall CVS.

evidence that places him there are cell phone tower records, which are not reliable indicators of actual location and are not evidence of criminal activity.

Lowe challenges the sufficiency of the evidence on all counts. We must view the facts in the light most favorable to the government, and must uphold the conviction if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979).

To convict on a Hobbs Act robbery, the government must prove a robbery and an effect on interstate commerce. 18 U.S.C. § 1951(a); United States v. Dean, 517 F.3d 1224, 1227-28 (11th Cir. 2008).  To convict on a Hobbs Act conspiracy, the government must show that (1) two or more people agreed to commit a Hobbs Act robbery; (2) that the defendant knew of the conspiratorial goal; and (3) that the defendant voluntarily participated in furthering that goal.  United States v. To, 144 F.3d 737, 748 (11th Cir. 1998). "To prove aiding and abetting a § 924(c) offense, the government must show that the substantive offense of carrying or using a firearm in relation to a crime of violence was committed, that the defendant associated himself with the criminal venture, and that he committed some act that furthered the crime."  United States v. Williams, 334 F.3d 1228, 1232 (11th Cir. 2003).

29

It is undisputed that the robberies occurred and that firearms were used to commit the crimes.  The video surveillance footage shown to the jury showed firearms were used in the robberies.  Robbery victims also testified that the robbers used guns: "one of them grabbed  me and pointed the gun at her temple to her head and the other one -- and the other one grabbed me by the neck and pointed the gun at my neck." DE 364 at 134; DE 277 at 382; DE 277 at 289.  The question is whether the Government introduced sufficient evidence to prove Lowe was involved in the robberies.

1. Farm Store

In his statement to police that was read to the jury at trial, Lowe told police he was at the Farm Store at the time of the robbery.  Lowe told police that Davis drove him to the Farm Store in the Ford Expedition.  DE 278 at 614.  In the transcript of his recorded statement to police that was provided to the jury, Lowe said, "I was in the truck. I wasn't known whatever they was on I wasn't (inaudible)." Gov't Ex. 114C at 22.  Also, in his statement to police that was read to the jury at trial, Lowe said when he was ordering chips from a woman at the Farm Store counter, he saw "two dudes came up from the back with ski masks and whatever." DE 278 at 613.  He continued, "[w]ere there two guys . . . . They had to be males because when she turned around and gave me the chips, that's when saying whatever they was saying.  We scurried off, like we hit it.  That was that."

DE 278 at 614-15.  In his recorded statement read at trial, Lowe told police he didn't call 911 after witnessing the robbery because his "phone was completely dead.  I ain't call no 911."  DE 2678 at 616.

The woman at the Farm Store counter, Lucia Quintero, testified at trial "[a] white car approached and some people inside asked for two – for some packages of Cheetos."  DE 364 at 132-33.  Quintero testified two men were in a Ford Expedition, one was driving and one was laying down in the passenger seat, "the one who was lying down, his skin was the color of my skin, but that is all I could see." DE 364 at 133.  Quintero testified her co-worker was serving the men in the truck when "[t]hrough the rear of the store two men came in and they were hooded . . . . Both of them had weapons in their hands, guns." DE 364 at 133-34.  Quintero testified after the men took "both cash registers, the money that was underneath and some cigarettes . . . then they took off . . . to the street and back of the store." DE 364 at 135-36.  Video surveillance shown to the jury at trial showed the Ford Expedition pull up and stop in the alleyway behind the Farm Store and two men enter the vehicle. DE 364 at 176; DE 278 at 559-600.  Finally, the Government introduced cell phone records at trial showing Lowe's phone "pinged" the cell

31

phone tower near the Farm Store right before the robbery occurred at 10: 32 p.m.

DE 279 at 816-17.[22]

2. Wendy's

Detective Arana testified that after Lowe initially denied being near the

Wendy's on the night of the arrest, he knocked on the door of the interview room

and asked to speak with the detectives again. DE 277 at 479.   Lowe then told

Arana that "he remember[ed] being near the Wendy's that night."  DE 277 at 479.

Arana testified that Lowe said

> earlier in the evening he was with his girlfriend, and they had gone to
> the Wendy's and had been at the drive-thru window and ordered food.
> When they went to the service window to pick up the food and pay for
> it, he noticed masked gunmen inside the store with guns. He also said
> he overheard one of them say something to the effect of give it up.

DE 277 at 479.

In addition, the jury heard text messages exchanged between Lowe and

Davis around the time of the Wendy's robbery about obtaining a getaway vehicle.

DE 279 at 795.  Lowe texted to Davis: "We got need a car to be behind us, you

know, not with that splat shit unless we get tailed.  That is kind of far." DE 279 at

---

[22] Detective Christie, who prepared the Government's summary exhibit, explained that the exhibit showed the location of the cell phone towers that were engaged to transmit each phone call on record, not the precise location of the phone.  DE 279 at 810-11.  The cell phone will "ping" the nearest tower unless it is at capacity, in which case it will ping the next available tower. DE 279 at 825-28.  Accordingly, the cell phone tower records are an approximation of the phone's location at the time of the call.

795.[23] Davis then texted to Lowe: "I'm trying to get the car from Niesha [Davis's sister]. She be on some sucka shit." DE 279 at 796. Davis's sister owns the white Solara in which police found evidence of the Wendy's robbery. DE 278 at 568. Then Lowe texted to Davis: "Tell Tia to ask when he get down if now its." DE 279 at 795. Detective Christie also testified that Lowe received a phone call from Davis approximately five minutes after the Wendy's robbery through the cell phone tower located on the same street as the Wendy's that was just robbed. DE 279 at 822.

3. CVS Hialeah

Lowe told police in a recorded statement played for the jury at trial that he was at the CVS Hialeah on the night that it was robbed. DE 278 at 543. Lowe said that he went into the store to buy Tylenol, but a sales clerk said they did not sell individual packages of the medicine, so he left without purchasing anything. DE 278 at 547-49. Yadira Lopez, an employee at the Hialeah CVS who witnessed the robbery, testified that four armed robbers entered the store with guns and threatened to kill him. DE 277 at 394-398. Lopez also testified that right before the robbers entered "somebody came into the store and asked me if we sold Waldryl Allergy, Walgreens pills" and said this request was unusual "[b]ecause he came in, asked the question, and immediately turned around, and didn't give me

---

[23] Detective Christie explained to the jury at trial that a "splat" is a term for a stolen car. DE 279 at 847.

33

the option to tell him about other choices we have available there." DE 277 at 397-98. Surveillance footage shown to the jury showed Lowe at the CVS in Hialeah a few minutes before the store was robbed at approximately 3 a.m. DE 277 at 398-99. The same surveillance footage showed four armed robbers entered the store shortly after Lowe left. DE 277 at 399-401.

The Government introduced into evidence a summary of cell phone records showing the date and time of cell phone calls mapped to the location of the cell phone towers. DE 279 at 810-11; Gov't Ex.'s 99, 101; see also, supra note 18. Cell phone records show that on May 17 Lowe and Davis exchanged numerous cell phone calls that pinged the Metro PCS cell phone towers near the Hialeah CVS between 2:30 a.m. and 3:00 a.m. DE 279 at 818-19.

4. Kendall CVS

The CVS in Kendall was robbed at around 3:30 a.m. on May 17, approximately half an hour after the Hialeah CVS was robbed that morning. As noted above, Lowe told the police in a recorded statement played at trial that he was at the Hialeah CVS at the time of the robbery, and video surveillance of the Hialeah CVS showed him in the store moments before the robbery occurred. DE 278 at 543.[24] Cell phone tower records showed Lowe exchanged cell phone calls

---

[24] In accordance with Bruton v. United States, 391 U.S. 123, 128, 88 S. Ct. 1620, 1623, 20 L. Ed. 2d 476 (1968) the Government redacted the recorded statements Ransfer and Hanna gave to police that were introduced into evidence to eliminate references to the other Defendants on trial.

with Davis at the Hialeah CVS  at 2:30 a.m., 2:32 a.m., 2:50 a.m.,  2:58 a.m., 2:59

a.m., 3:00 a.m. DE 279 at 818-19.[25]  Then at 3:06 a.m. the phone records show

calls were placed as both phones moved south toward the Kendall CVS.  DE 279 at

819.  Five calls were exchanged when both phones were located near cell towers at

the Kendall CVS between 3:14 a.m. and 3:19 a.m. DE 279 at 820.  Then Lowe and

Davis exchanged another three calls at that location between 3:20 a.m. and 3:27

a.m.  Lowe's phone was then used at 3:38 a.m. a few blocks south of the Kendall

CVS and again near Davis's house at 4:14 a.m. Davis used his phone near a cell

tower at the same location at 4:17 a.m.

5. Lowe's Presence at Three of the Stores During the Robberies and His
Inconsistent Statements Are Inculpatory

Based on the evidence introduced at trial, the jury could conclude that Lowe

gave inconsistent statements to police about his conduct on the nights of the

robberies.  Detective Arana testified at trial that Lowe initially told police that he

was not at the Wendy's,[26] but that Lowe later told police he was at the Wendy's

drive-through with his girlfriend and saw it being robbed.  DE 277 at 478-79.  In

---

DE 94.  Lowe argues that Ransfer did not identify Lowe among the participants in the CVS
Hialeah robbery in his recorded statement to police that was played at trial.  DE278 at 567-68.
However, any reference to the other Defendants was omitted.  The record of the suppression
hearing, which includes the unredacted statements submitted as exhibits to the Government's
response to the motion to suppress, shows the extent to which each Defendant's statements
identified the other Defendants.  DE 64-67.

[25]  See supra note 18.

[26] In the transcript of his recorded statement to police that was provided to the jury, Lowe said "I
never been in a truck with Tay and Trevor.  I never been in the truck with them."  DE 67-2 at 25.

his recorded statement read to the jury at trial, Lowe initially told police he was not at the Farm Store either, but then later admitted he went there to buy chips when "two dudes came up from the back with ski masks." DE 278 at 611-13. In the same statement read to the jury, Lowe also told police that he could not call 911 after he witnessed the Farm Store robbery because his phone battery was dead. DE 278 at 615. But Detective Christie, who prepared the cell phone summaries, testified that the cell phone records show Lowe made a call at 11:03 p.m., right after the Farm Store was robbed at 10:40 p.m. DE 279 at 816-17. In his recorded statement read to the jury at trial, Lowe also denied knowing anyone with a Ford Expedition or having been inside of one, DE 278 at 607, but then admitted that Davis drove him to the Farm Store in a white Ford Expedition. DE 278 at 608-9.

6. Summary

The text messages exchanged between Lowe and Davis are evidence of an agreement between at least Lowe and Davis. They also show that the jury could find Lowe knew of the goal to rob and voluntarily participated in at least some of the robberies. The video surveillance and testimony about the use of guns in all of the robberies suggests that Lowe associated himself with crimes of violence. Lowe's own statements to the police placed him at the Farm Store, the CVS Hialeah, and the Wendy's, immediately prior to or during each of the robberies. DE 278 at 543; DE 278 at 611-13; DE 277 at 478-79. As discussed above,

36

Detective Christie testified that the cell phone records showed phone calls between Lowe and Davis were placed immediately before and after each robbery, and that Lowe's phone was used at or near the robbery locations. DE 279 at 815-22.[27] Based on the cell phone records and surveillance footage introduced at trial, a jury could find that Lowe was at the stores at the time of the robberies. See supra note 18.

Viewing the evidence in the light most favorable to the Government, a reasonable trier of fact could find that the testimony, video surveillance, and cell phone records support the Government's theory that Lowe furthered each robbery by acting as a scout, lookout, or to divert or distract store employees during the Farm Store, Wendy's, and Hialeah CVS armed robberies. The jury could have concluded that Lowe's statements were fictitious attempts to explain his presence at the same three stores at the precise time they were being robbed, in the same manner by the same crew with the same getaway vehicle. The jury could conclude Lowe's presence at these three businesses precisely when they were being robbed,

_____

[27] The Farm Store was robbed at approximately 10:40 p.m. Cell phone records showed calls between Davis and Lowe at that location at 10:14 p.m., 10:32 p.m. and 11:03 p.m. DE 279 at 816-17. The Hialeah CVS was robbed at approximately 3 p.m., and cell phone records show calls between Lowe and Davis at Hialeah at 2:30 a.m., 2:32 a.m., 2:50 a.m., 2:58 a.m., 2:59 a.m., 3:00 a.m. DE 279 at 818-19. Then, at 3:06 a.m. the phone records show calls were placed as both phones moved south toward the Kendall CVS. DE 279 at 819. Five calls were exchanged when both phones were located near cell towers at the Kendall CVS between 3:14 a.m. and 3:19 a.m. DE 279 at 820. Then Lowe and Davis exchanged another three calls at that location between 3:20 a.m. and 3:27 a.m. Gov't Ex. 101. Lowe's phone was then used at 3:38 a.m. a few blocks south of the Kendall CVS and was used near Davis's house at 4:14 a.m. Gov't Ex. 101. Davis used his phone near a cell tower at the same location at 4:17 a.m. Gov't Ex. 101.

37

over a five-week period, was so unlikely to be an innocent coincidence, and instead was incriminating. A reasonable jury could find the Government showed an inculpatory pattern of Lowe's presence at each of the stores immediately prior to the robberies. Lowe admitted to the police he witnessed the Farm Store and Wendy's robberies when he was ordering food. The surveillance footage at the CVS in Hialeah, Lowe's statement to police that he went into the Hialeah CVS, and the store employee's statement about an unusual request, just before the robbery support the Government's theory that Lowe was scouting out the store in advance of the armed robbery.

As to the Kendall CVS, cell phone tower records show Lowe placed calls near the Hialeah CVS. Then immediately after the robbery at 3 a.m., Lowe placed calls moving southward toward and eventually near the Kendall CVS. These calls support a finding that Lowe was at or near the Kendall CVS with the rest of the crew.

Lowe did not admit he was present near the Kendall CVS at any time. Although only circumstantial evidence places Lowe near the Kendall CVS, we must view the facts in the light most favorable to the Government and can only overturn a conviction if we find no reasonable trier of fact could have found guilt beyond a reasonable doubt. Jackson, 443 U.S. at 319, 99 S. Ct. at 2789.

Three pieces of evidence tie Lowe to being at or near the Kendall CVS robbery:

(1) Lowe's statement to police he was at the Hialeah CVS;

(2) video surveillance showing Lowe at the Hialeah CVS moments before the robbery; and

(3) cell phone tower records showing Lowe's phone pinged the cell phone tower near the Kendall CVS at the time of the robbery, and made calls to and from Davis.

This follows a pattern of cell phone calls demonstrating Lowe's presence at the other three robbery locations immediately prior to or during the robberies. DE 278 at 543; DE 278 at 611-13; DE 277 at 478-79. Given the evidence supporting this pattern, and the cell phone records showing Lowe was near the Kendal CVS, a reasonable trier of fact could find beyond a reasonable doubt that Lowe "associated himself with" the Kendall CVS robbery.  DE 280 at 938.  But there is no evidence that Lowe was ever inside the Kendall CVS or that he did anything prior to or during the robbery of the Kendall CVS to further the crime.  Accordingly, there was insufficient evidence that Lowe acted in furtherance of the Kendall CVS robbery.

In sum, viewing the evidence in the light most favorable to the government, a reasonable jury could find beyond a reasonable doubt that Lowe associated

39

himself with and acted to further the Farm Store, Hialeah CVS, and Wendy's robberies.  Jackson, 443 U.S. at 319, 99 S. Ct. at 2789.  Since there was no evidence of Lowe's conduct at the Kendall CVS, and evidence of his presence in the vicinity alone is insufficient to convict for aiding and abetting the CVS Kendall robbery, we will vacate the judgment against Lowe on Counts 12 and 13, pertaining to the Kendall CVS robbery, instruct the District Court to vacate the verdict on these counts, and remand on sentencing.

## D. Suppression of Post-Arrest Statements by Defendants

In addition to challenging the statements following the warrantless GPS search,

Appellants contend their statements to the police were not voluntary and that they were unaware of their Fifth Amendment rights.  A defendant must be informed of his Fifth Amendment rights prior to questioning, but a "defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966).  Voluntariness is a two-part inquiry.

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of

40

comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived.

<u>Moran v. Burbine</u>, 475 U.S. 412, 421, 106 S. Ct. 1135, 1141, 89 L. Ed. 2d 410 (1986).  "We consider the totality of the circumstances, including the details of the interrogation and the defendant's characteristics, when deciding whether a confession was voluntary."  <u>United States v. Bernal-Benitez</u>, 594 F.3d 1303, 1319 (11th Cir. 2010).  Factors considered include the defendant's lack of education or low intelligence, failure to appraise the defendant of his rights, the length of detention, "the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep."  <u>Waldrop v. Jones</u>, 77 F.3d 1308, 1316 (11th Cir. 1996) (quoting <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973)).

Each of the Appellants executed a signed waiver of their <u>Miranda</u> rights, acknowledging that they were informed of their Fifth Amendment rights. DE 278 at 604 (Lowe); DE 277 at 580-81 (Ransfer); DE 277 at 188-98 (Hanna). Police interviewers also went over the <u>Miranda</u> waiver form and Fifth Amendment rights with each Defendant.  DE 66-2 at 3-4 (Ransfer); DE 65-1 at 4 (Hanna); and DE 67-2 at 2 (Lowe). Each Appellant contends the waiver and statements were not voluntary because each was held for more than twenty-four hours and subject to coercion.  But the questioning did not last for twenty-four hours; the transcripts of the recorded statements show some interviews were as short as two or ten minutes,

41

and others were as long as an hour and fifteen minutes.  DE 66-7; DE 66-5.

Moreover, as the Magistrate Judge correctly noted, officers may detain suspects up

to forty-eight hours before a probable cause hearing, County of Riverside v.

McLaughlin, 500 U.S. 44, 56-7, 111 S. Ct. 1661, 1670, 114 L. Ed. 2d 49 (1991),

and this court has found a defendant's statements to police were voluntary despite

the defendant's five-day detention for questioning.  Lawhorn v. Allen, 519 F.3d

1272, 1291 (11th Cir. 2008).

After a three-day suppression hearing, the Magistrate Judge found no

credible evidence that Defendants were subject to physical punishment and that

they were all offered food and restroom breaks throughout the course of their

detention.  DE 120 at 12.  The Magistrate Judge also found that despite their

relative youth, all the Defendants understood their Fifth Amendment rights before

agreeing to waive them.  DE 120 at 26-27.  Defendants do not point to any

evidence on the record showing these findings were erroneous.

**E. Miscellaneous Issues**

1. Sufficient Evidence of Effect on Interstate Commerce

Appellants contend there was insufficient evidence of the effect on interstate

commerce to convict them under the Hobbs Act.  "'[C]ommerce is affected when

an enterprise, which either is actively engaged in interstate commerce or

customarily purchases items in interstate commerce, has its assets depleted through

42

extortion, thereby curtailing the victim's potential as a purchaser of such goods.'" United States v. Jackson, 748 F.2d 1535, 1537 (11th Cir. 1984) (quoting United States v. Elders, 569 F.2d 1020, 1025 (7th Cir. 1978)). "[T]he government need only show a minimal effect on interstate commerce to sustain jurisdiction under the Hobbs Act." United States v. Alexander, 850 F.2d 1500, 1503 (11th Cir. 1988); see also United States v. Castleberry, 116 F.3d 1384, 1387 (11th Cir. 1997) (finding United States v. Lopez, 514 U.S. 549, 115 (1995) "did not change the measure of evidence needed to support the interstate commerce element of a Hobbs Act case").

In United States v. Guerra, there was sufficient impact on interstate commerce where $300 in cash was stolen from a gas station that was part of national chain and the store was closed for more than two hours while police investigated the robbery. 164 F.3d 1358, 1361 (11th Cir. 1999); see United States v. Rodriguez, 218 F.3d 1243, 1244-45 (11th Cir. 2000) (finding a robbery of a motel impacted interstate commerce because it hosted out-of-state customers, even though there was no evidence the hotel had to shut down or turn away customers due to the robbery). Here, the Government introduced evidence that the Farm Store, the Doral Ale House, the Wendy's, and the two CVS locations, regularly purchased goods that traveled in interstate commerce, that money was taken from each store in each robbery, and that each store had to shut down for several hours

43

as a result the robberies. DE 277 at 383, 386-87, 420-22 (Doral Ale House); DE 277 at 362-66 (Farm Store); DE 277 at 372-74 (CVS); DE 278 at 528-29 (Wendy's). Accordingly, there was sufficient evidence that a reasonable trier of fact could find the robberies impacted interstate commerce.

## 2. Exclusion of Lowe's Medical Expert Witness

Lowe sought to introduce testimony by Dr. John Marracini that Lowe could not have caused the injury to Detective Armentero's head. Defendant contends this evidence was crucial because it shows that Lowe was beaten during the course of his arrest, affecting the reliability of Lowe's post-arrest statement to police.[28]

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." Fed. R. Evid. 401. Relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. We review evidentiary rulings for abuse of discretion. United States v. Russell, 703 F.2d 1243, 1249 (11th Cir. 1983).

---

[28] Lowe also contends that the evidence would show he did not strike Armenteros before Lowe was hit. But the Government did not introduce evidence that Lowe caused the injury to Armenteros. Instead, Lowe's attorney elicited this testimony on cross-examination. DE 276 at 216. The District Court correctly held this did not render the evidence admissible because the Defendant "raised it in the first instance yourself . . . [and t]he witness gave you his answer and now you are trying to, in effect, impeach your own witness on this point with collateral evidence, which you cannot do." DE 276 at 304.

Detective Armenteros testified that he punched Lowe several times because Lowe resisted arrest. DE 276 at 214-15. Accordingly, the jury already heard evidence that Lowe was physically assaulted during the course of his arrest.

Ruling from the bench during the trial, the District Court found the evidence was not relevant because the central issue was how Lowe was struck before giving his statement, not how the officer was struck. DE 364 at 15. The Court further found that any potential relevance would be substantially outweighed by the potential for confusion and a waste of time. DE 364 at 19. We agree that this evidence does not tend to prove or disprove any fact related to Lowe's post-arrest statement to police. As the District Court said, "it doesn't make a difference how the officer was hit or not hit, or what he was hit with . . . the purpose of this is the condition of the defendant and whether he was roughed up and how he was roughed up." DE 364 at 15. The District Court acted within its discretion in so ruling. Not only would this irrelevant evidence waste time, but it also had the potential to confuse the central issue, which was Lowe's condition before he gave his statements. Accordingly, the District Court did not abuse its discretion in excluding the testimony of Dr. John Marracini.

3. Closing Argument Limited to Twenty Minutes

Lowe contends the District Court impermissibly restricted his attorney's closing argument to twenty minutes. "The period of time to be allotted for

45

attorneys' closing arguments is within the sound discretion of the district court."
United States v. Carter, 760 F.2d 1568, 1581 (11th Cir. 1985).  In United States v.
Sotelo, the Fifth Circuit found it was not an abuse of discretion to limit closing
arguments to ten minutes in a factually-complex, twelve-count indictment with
forty witness because the appellants "made no offer of proof as to what arguments
they were foreclosed from presenting at trial." 97 F.3d 782, 794 (5th Cir. 1996)
("Having reviewed the record, we find no abuse of discretion; the appellants'
closing arguments adequately summarized the evidence and arguments and nothing
in the record indicates what additional items would have been covered during
closing had the trial allowed additional time.").  Similarly, Lowe does not point to
any arguments his attorney was not able to cover in the twenty minutes allotted for
his closing argument.  Since Lowe failed to identify any prejudice to his defense,
we do not find the limitation was an abuse of discretion.

4. Admission of Lay Witness Opinion

Hanna contends it was an error to allow the Metro PCS records custodian,
Michael Stephen Dikovitsky, to testify as to his opinion beyond his expertise.  "If a
witness is not testifying as an expert," Rule 701 limits "testimony in the form of an
opinion." Fed. R. Evid. 701.  Here, Dikovitsky explained how cell phone towers
record "pings" from each cell phone number and how he mapped the cell phone
tower locations for each phone call for Exhibits 99, 100 and 101.  DE 277 at 429-

45.[29]  Hanna does not point to any statements of opinion by Dikovitsky, and we do not find any in the record. Hanna does not contend that this testimony was beyond the witness's personal knowledge or that Dikovitsky should have been treated as an expert witness.  We rely on United States v. Hamaker, where we held a financial expert's testimony matching billing records to payroll and accounting records were factual statements, not statements of opinion. 455 F.3d 1316, 1331-32 (11th Cir. 2006).  The testimony did not require expertise because it was a summary of financial records the witness reviewed and an explanation of how the summary was calculated.  Id.  Moreover, there is no suggestion that the information presented was inaccurate or prejudicial to Hanna.  Since the witness did not offer any opinions, the District Court could not have erred in admitting the testimony under Rule 701.

## CONCLUSION

We find the Davis good-faith exception to the exclusionary rule applies because it was reasonable for the police to rely on the clear precedent articulated in Michael—that reasonable suspicion is sufficient to support the warrantless installation of an electronic surveillance device on a vehicle.  Admitting Sergeant Villaverde's testimony was not reversible error because the content of the statements was introduced elsewhere in the record. We do not find the District

---

[29] As noted, Detective Christie testified without objection about how cell phones "ping" off cell towers.  We express no view on the propriety of this testimony.

47

Court abused its discretion in excluding testimony by Dr. Maracaini, limiting Lowe's closing argument to twenty minutes, or admitting Michael Stephen Dikovitsky's testimony.

There was substantial evidence showing Lowe associated himself with and acted to further the Farm Store, Hialeah CVS, and Wendy's robberies, as well as conspired with others to rob. Therefore, a reasonable trier of fact could find beyond a reasonable doubt that he was guilty of conspiracy, aiding and abetting Hobbs Act Robbery and possession of firearms in the furtherance of a crime. There was no evidence, however, that Lowe acted to further the Kendall CVS robbery.

Accordingly, the judgments and sentences of Ransfer and Hanna are affirmed. The conviction of Lowe on Counts 1, 8, 9, 10, 11, 14 and 16 is also affirmed. We vacate the judgment of conviction of Lowe on Counts 12 and 13, and remand with instructions to the District Court to enter a judgment of acquittal on these counts and to resentence Lowe.

**Affirmed in part; vacated in part and remanded.**