[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-12018

_____

D.C. Docket No. 1:12-cr-20423-KMM-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

 versus

RAFAEL UBIETA,

Defendant-Appellant.

_____

No. 13-12020

_____

D.C. Docket No. 1:12-cr-20423-KMM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

 versus

ANGEL BARROSO,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(November 3, 2015)

Before WILLIAM PRYOR, JULIE CARNES, and SILER,[*] Circuit Judges.

SILER, Circuit Judge:

A jury convicted Rafael Ubieta and Angel Barroso of conspiracy to commit wire fraud and wire fraud. They now appeal their convictions and sentences. For the reasons explained below, we affirm.

**I.**

In 2012, a grand jury indicted Ubieta, Barroso, and several codefendants with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and five counts of wire fraud, in violation of 18 U.S.C. § 1343. The indictment alleged that the defendants conspired to purchase residential properties through the use of straw buyers. The applications for those straw buyers contained false information, which typically overstated the straw buyer's income and other

_____

[*] The Honorable. Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

2

assets. Then, the defendants submitted false mortgage applications and closing documents, and lenders disbursed the loan proceeds for unapproved uses. The majority of the defendants pleaded guilty, but Ubieta and Barroso proceeded to trial and were convicted on all six counts. Ubieta and Barroso now appeal their convictions and sentences.

Ubieta was an attorney. He served as the president of Bayside Title Services (Bayside Title) and as the title agent for the real estate transactions in this case. As a title agent, Ubieta was not supposed to close a property deal if a problem emerged, such as if a buyer failed to submit a cash-to-close payment, which is an up-front payment made by the buyer that ensures the buyer has some stake in the property. However, on several occasions, he released the lenders' proceeds prior to receiving the cash-to-close payment. Ubieta was also responsible for verifying that the seller held title to a property, but on several occasions, he did not.

Barroso was the president of Two B Investment Group (Two B) and helped identify properties to be purchased by straw buyers. He was also involved in recruiting straw buyers, two of which are relevant to the issues on appeal.

The first straw buyer, Beatriz Perez, was told by Barroso that Perez's estranged father had bequeathed money and property to her. Perez accompanied Barroso to an attorney's office where she signed papers that she thought related to the inheritance, but instead, she signed a sales and purchase agreement for property

3

located at 1985 South Ocean Boulevard. The application stated that Perez earned over $16,000 a month, rather than her actual salary of $1,000 per month.

The lender approved the application and required $7,888 at closing, which Perez never paid. Nevertheless, Bayside Title dispersed over $500,000 in loan proceeds at closing—$137,000 of which went to Two B. Perez soon received mortgage statements, which she could not pay, and the property entered into foreclosure.

The second relevant straw buyer was Julio Diaz. In 2006, Barroso asked Diaz if he had a good credit rating and if he would be interested in purchasing a property that Barroso owned. Diaz agreed to purchase the property, and Barroso agreed to then rent the property for profit. To close the transaction, Diaz provided copies of his permanent resident card, his driver's license, and his social security card. Diaz signed the purchase and sale agreement and received a $1 million mortgage. Barroso gave Diaz a $10,000 check at the end of the transaction. Diaz later pleaded guilty to fraud in regard to that transaction because the loan application overstated his assets and income.

The 2012 indictment in this case alleged that Diaz agreed to be a straw buyer for a second time in 2007, but the grand jury did not indict Diaz as a co-conspirator. At trial, Diaz testified that he did not agree to another real estate transaction with Barroso. Instead, someone used Diaz's social security card and

4

other personal identifiers to purchase property located at 185 SW 7th Street. The loan application again overstated Diaz's income and assets, and a loan was secured in Diaz's name. The loan contained a signed copy of Diaz's social security card, but police investigations later revealed that Diaz's actual social security card remained unsigned, lending credence to Diaz's testimony. The lender approved the loan, but required a cash-to-close payment of $47,600, which Diaz never paid. Nevertheless, Bayside Title disbursed over $900,000—$192,300 of which was sent to Two B.

A government audit of Bayside Title revealed that Bayside Title's disbursements of the loan proceeds flowed back to Bayside Title as cash-to-close payments, or into the accounts of Barroso, Ubieta, and the other co-conspirators.

Barroso and Ubieta raise many issues on appeal. Accordingly, we address the facts and legal standards applying to each issue in turn.

## II.

**1. Whether the district court erred when it allowed Ubieta to substitute counsel without a hearing.**

Early in the case, the district court granted the defendants' initial motion to continue the original trial date from October 22, 2012 to January 14, 2013. Jose Quiñon, Ubieta's original attorney, entered his appearance on October 15, 2012. On November 9, 2012, codefendant William Hartnett moved to disqualify attorney Quiñon because he had "engaged in substantial attorney-client protected

5

communications with . . . Quiñon."  After the district court ordered the parties to respond to the motion to disqualify counsel, Ubieta, through attorney Quiñon, filed a notice to substitute counsel, stating that Ubieta was "actively interviewing with other criminal defense attorneys in the community."  The district court then denied as moot Hartnett's motion to disqualify Quiñon.  Ubieta did not advise the court that he opposed the substitution of counsel or Hartnett's motion.  Indeed, three days later, Ubieta filed a stipulation of substitution of counsel, introducing Edward R. Shohat as Ubieta's new counsel; the stipulation was signed by Quiñon, Shohat, *and* Ubieta.  Ubieta specifically agreed that he "consent[ed] to being represented in this matter by . . . Edward R. Shohat."

Ubieta now claims that the "district court erred in failing to conduct a *Garcia* hearing to determine whether Mr. Ubieta's counsel of choice had a non-waivable conflict of interest."  Ordinarily, we review a district court's decision to disqualify a defendant's counsel for abuse of discretion.  *United States v. Campbell*, 491 F.3d 1306, 1310 (11th Cir. 2007).  However, the district court never disqualified Quiñon because Quiñon withdrew from the case without objection by any party, including Ubieta.  Accordingly, to the extent there is anything for us to review, we must review for plain error.  *See United States v. Serrapio*, 754 F.3d 1312, 1322 (11th Cir. 2014) (noting that arguments not presented to the district court are reviewed for plain error).

To resolve a motion to disqualify counsel, a district court typically holds a hearing to weigh the competing rights to conflict-free representation and counsel of one's choice. *See In re Paradyne Corp.*, 803 F.2d 604, 607–08 (11th Cir. 1986). Ubieta relies on *United States v. Garcia*, in which the Fifth Circuit remanded the case to the district court with direction for the "district court to scrupulously evaluate the insistence of the defendants on the right to privately retained counsel of their choice even though the district court may discern a conflict of interest in such representation . . . . The trial court should actively participate in the *waiver* decision." 517 F.2d 272, 277 (5th Cir. 1975) (emphasis added).

However, the record in this case clearly demonstrates that there was no *waiver* of Ubieta's right to conflict-free counsel. Indeed, Ubieta agreed in writing to his new counsel's representation. These circumstances do not mandate a *Garcia* hearing because Ubieta did not express any interest in retaining Quiñon as his counsel after learning that there was a possible conflict and that Quiñon sought to withdraw from the case. The district court did not err by falling to *sua sponte* investigate whether Ubieta should retain his original counsel.

Ubieta's arguments that there may not have been a conflict between him and his original counsel and that the trial court should have reiterated the trial date so that Ubieta and counsel could have made a more informed decision are irrelevant as to whether Ubieta was entitled to a non-requested and unwarranted *Garcia*

7

hearing. Here, there were no competing interests—i.e. counsel of Ubieta's choice and conflict-free counsel—because Ubieta agreed to retain new counsel of his choice who was also free from any possible conflict of interest.

**2. Whether the district court abused its discretion when it denied Ubieta's motion to continue after he retained new counsel.**

Almost a week after Shohat entered his appearance, he filed an unopposed motion to continue the trial date and cited his recent entry into the case and the complexity of the case in support of his motion. A week before trial, the court denied the motion. At a hearing four days before trial, attorney Shohat reiterated his motion. The district court responded that Shohat knew the trial date prior to his decision to represent Ubieta, and therefore, the case did not warrant a continuance.

We review a denial of a motion to continue for abuse of discretion. *United States v. Valladares*, 544 F.3d 1257, 1261 (11th Cir. 2008) (per curiam).

Ubieta[1] argues that the district court abused its discretion when it denied his motion to continue because "Mr. Ubieta's counsel of choice was disqualified approximately 42 days prior to the commencement of trial due to a purported conflict of interest," and thus, new counsel did not have enough time to prepare for trial. As an initial matter, Ubieta's original counsel was never disqualified.

---

[1] Barroso seeks to adopt Ubieta's argument that the district court erred by not granting his request for a continuance. Strangely, Barroso never filed his own motion to continue the trial after the defendants' initial motion to continue the original trial date was granted; nor did he join in Ubieta's motion. He therefore "has failed to preserve that issue for appellate review." *See United States v. Schlei*, 122 F.3d 944, 983 (11th Cir. 1997).

8

Moreover, Attorney Shohat entered his appearance on Ubieta's behalf roughly thirty-nine days prior to trial.  Finally, Ubieta was arraigned on October 15, 2012, and the trial began January 14, 2013.

Ubieta relies on *United States v. Verderame*, 51 F.3d 249 (11th Cir. 1995), to support his argument.  In *Verderame*, a defendant was arraigned on May 4 and proceeded to trial on June 7, despite the defendant's four unopposed motions to continue.  *Id.* at 250–51.  We reasoned that, "[u]nder certain circumstances, denial of a motion for continuance of trial may vitiate the effect" of a defendant's Sixth and Fourteenth Amendment rights to assistance of counsel and due process.  *Id.* at 251.  "To prevail on such a claim, a defendant must show that the denial of the motion for continuance was an abuse of discretion which resulted in *specific substantial prejudice*."  *Id.* (emphasis added).  In *Verderame*, the brief time window prior to trial rendered defense counsel unable to defend against "two major drug trafficking conspiracies and the forfeiture of almost all of [the defendant's] property including his home" because he only had thirty-four days to prepare for a trial, in which the government "abruptly shifted focus away from the cocaine conspiracy a mere four days before trial."  *Id.* at 251–52.  Furthermore, there was not enough time for the defense "to gather the requisite financial information, obtain pertinent travel papers, interview witnesses, and review documents the government continued to provide up to the day of trial."  *Id.* at 252.

9

The government cites *United States v. Valladares*, 544 F.3d 1257 (11th Cir. 2008) (per curiam), in support of its position. In *Valladares*, we reiterated that there "are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case." *Id.* at 1262 (internal quotation marks omitted). The defendant must show "specific substantial prejudice," by identifying "relevant, non-cumulative evidence that would have been presented if [his] request for a continuance had been granted." *Id.* (internal quotation marks omitted). Although the defendant's counsel in *Valladares* only had thirty-five days after arraignment to prepare a defense, we concluded that the district court did not err by denying the motion to continue because:

> defense counsel had more than a month to prepare, and . . . the government had identified all of the documents it intended to use. Valladares has not pointed to any specific documents or relevant, non-cumulative evidence she would have presented, nor have we found anything in the record that would indicate a different result had the motions been granted.

*Id.* at 1264 (internal quotation marks omitted).

A nearly identical situation presents itself here, and the district court did not abuse its discretion when it denied Ubieta's motion to continue. First, Ubieta "has not pointed to any specific documents or relevant, non-cumulative evidence [he] would have presented . . . that would indicate a different result had the motions been granted." *Id.* (internal quotation marks omitted). Ubieta rehashes the

10

arguments his attorney asserted before the district court, but he does not cite to a single piece of evidence he would have unearthed had his motion to continue been granted. Although the case involved a great number of documents, Ubieta should have been familiar with many of them. Moreover, the documents would have been available to attorney Shohat as soon as he entered his appearance, which is in contrast to the situation in *Verderame*, in which defense counsel received documents up to the day of trial. 51 F.3d at 252. Moreover, the government did not shift focus in this case shortly before trial, as was the case in *Verderame*. *Id.* at 251–52.

Finally, Ubieta continues to stress in his brief that the government had over forty months to investigate and prepare, but his attorney had only "thirty-nine days" to prepare for trial. But the government will almost always have a longer timetable to investigate a case, and that comparison alone does not establish substantial prejudice. Furthermore, as the district court reiterated during the pre-trial hearing, attorney Shohat was aware of the trial date when he agreed to represent Ubieta and should not have relied on a continuance of the trial date in order to be fully prepared for trial.

11

**3. Whether the district court abused its discretion when it invoked the rule of sequestration as to one of Ubieta's witnesses, over his request that she remain present during all the proceedings.**

Shortly before trial began, the government invoked the rule of sequestration. Ubieta requested that the district court exempt his wife, Sheila Ortiz, from the rule of sequestration because he "need[ed] her help." Specifically, Ortiz would assist with Ubieta's defense because she was knowledgeable about the documents at issue and had worked at Bayside Title. Attorney Shohat indicated that, while he did not anticipate calling her as a witness, he could not "absolutely guarantee it" because it depended on what occurred during the government's presentation of its case. The district court denied Ubieta's request, and Shohat announced that Ubieta would forego calling Ortiz as a witness in order to allow her to remain present and assist during the trial.

"Whether to sequester [a] witness [is] clearly within the sound discretion of the trial court." *Judisch v. United States*, 755 F.2d 823, 827 n.8 (11th Cir. 1985) (citing *United States v. Nash*, 649 F.2d 369, 371 (5th Cir. 1981)). We review the district court's decision for abuse of discretion. *See Nash*, 649 F.2d at 371; *United States v. Alvarado*, 647 F.2d 537, 540 (5th Cir. 1981).

"At a party's request, the court must order witnesses excused so that they cannot hear other witnesses' testimony." Fed. R. Evid. 615. Rule 615 excludes from the rule's sequestration requirements "a person whose presence a party shows

12

to be essential to presenting the party's claim or defense." *Id.* Ubieta argues that Ortiz fell into this exempted category because, like an agent for the government, Ortiz had complete knowledge of the documents and could assist counsel during the trial.

In support of his position, Ubieta relies on *United States v. Klaphake*, 64 F.3d 435, 437 (8th Cir. 1995), for the proposition that when a party seeks "to exempt a witness from a sequestration order [he] must show that the witness has such specialized expertise or intimate knowledge of the facts that the party could not effectively function in the witness's absence." As an initial matter, *Klaphake* is not binding on us. Furthermore, Ubieta "has failed to establish that his attorney could not effectively function in [Ortiz's] absence" because Ortiz could have assisted counsel *prior* to trial. *Id.* Since Ubieta was the president at Bayside Title, Ubieta also would have been familiar with Bayside Title documents and should have been able to assist his attorney without Ortiz's help.

Furthermore, the purpose of Rule 615 was served by the district court's decision to invoke the rule of sequestration as to Ortiz. The rule of sequestration serves to: (1) exercise a restraint on witnesses attempting to tailor their testimony to that of earlier witnesses; and (2) "it aids in detecting testimony that is less than candid." *Geders v. United States*, 425 U.S. 80, 87 (1976). Since if Ortiz testified she would serve as a rebuttal witness, the district court's decision not to exempt her

13

from the rule of sequestration was soundly within in its discretion. No proffer of her proposed rebuttal testimony appears in the record.

**4. Whether the district court abused its discretion when it admitted evidence of Barroso's prior conviction.**

Diaz testified at trial that he agreed to purchase property from Barroso in 2006. For purchasing the home, Diaz received a $10,000 check from either Barroso or Barroso's wife. Although Diaz testified at trial that he was innocent of any bad intent, he acknowledged that he pleaded guilty to wire fraud in relation to that transaction because the application for the loan overstated his wealth. Barroso was also convicted of wire fraud in connection with that transaction.

The superseding indictment in this case alleged that Diaz again "acted as a straw buyer who allowed his identity and credit to be used in the purchase" of a second property located at 185 SW 7th Street. At trial, Diaz testified that he did not agree to purchase property located at 185 SW 7th Street, and the evidence indicated that somebody else, likely Barroso, had used Diaz's identity to purchase the second property.

Prior to trial, Barroso moved to exclude evidence of his prior conviction for conspiracy to commit wire fraud in connection with the 2006 Diaz transaction. The district court denied that motion and concluded that the evidence of Barroso's prior guilty plea was "inextricably intertwined with the instant matter." Moreover,

14

the district court concluded the evidence was alternatively appropriate under Rule 404(b) to demonstrate Barroso's intent, motive, and knowledge.

We review the district court's evidentiary ruling for abuse of discretion. *United States v. Sterling*, 738 F.3d 228, 234 (11th Cir. 2013).

Evidence of a crime "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b). "Rule 404(b) does not apply when the other act evidence is linked in time and circumstances with the charged crime and concerns the context, motive or setup of the crime, or forms an integral part of the crime, or is necessary to complete the story of the crime," and therefore, it is not extrinsic evidence subject to Rule 404(b). *United States v. US Infrastructure, Inc.*, 576 F.3d 1195, 1210 (11th Cir. 2009).

The district court did not abuse its discretion when it concluded that the evidence of Barroso's prior conviction was inextricably intertwined with the charged crime because the prior crime was both "necessary to complete the story of the crime" and concerned the context and setup of the crime at issue. *See id.* Barroso's guilty plea established that he had access to Diaz's confidential information that Barroso could have used to purchase the second property at 185 SW 7th Street in Diaz's name without Diaz's consent. *See id.* at 1211 (affirming the district court because the evidence of past criminal activity helped prove "the

15

chain of events surrounding the charged crimes, including context and setup"); *United States v. Cardenas*, 234 F. App'x 892, 897–98 (11th Cir. 2007) (affirming the district court's decision to admit evidence of prior bad acts because evidence of defendant's prior drug dealings with the witness explained why the defendant approached the witness to distribute drugs, which was the present charge).

Barroso argues his previous conviction was too different from the crime charged and, therefore, the evidence was not "inextricably intertwined." However, the question is not whether the crimes were similar, but whether the prior bad act "concerns the context, motive or setup of the [charged] crime, or forms an integral part of the crime; or is necessary to complete the story of the crime." *US Infrastructure, Inc.*, 576 F.3d at 1210. The answer to that question is yes.

Barroso maintains that his "prior conviction was utterly devoid of permissible, probative value yet its potential to unfairly prejudice the jury was great." This amounts to a Fed. R. Evid. 403 argument. Barroso made intent an issue by pleading not guilty and by arguing at trial that he was simply ignorant of the illegal conduct. *See Edouard*, 485 F.3d at 1345 ("A defendant who enters a not guilty plea makes intent a material issue." (internal quotation marks omitted)). The evidence of Barroso's conviction explained how he likely defrauded Diaz in order to complete the second fraudulent purchase of 185 SW 7th Street. The evidence is

16

probative and outweighs any fear of prejudice that naturally comes with the jury's learning about a prior crime committed by a defendant.

Finally, the district court limited any prejudice to Barroso when it instructed the jury that "each defendant is on trial only for the specific crimes charged in the indictment." "We presume that a jury follows the court's instructions." *United States v. Shenberg*, 89 F.3d 1461, 1472 (11th Cir. 1996).

**5. Whether the district court committed plain error by failing to exclude a portion of Beatriz Perez's testimony as hearsay.**

Perez was told by Barroso that her father had died, so she went to an attorney's office with Barroso and signed documents without reviewing them, which resulted in Perez's unknowingly purchasing property located at 1985 South Ocean Drive. On redirect examination, the government asked Perez whether her father had actually died, to which Perez responded: "No, sir. He's alive." The following exchange ensued:

> Q: At what point did you find that out?
> A: [The case agent] called me and informed me.
>     Mr. Shohat [Ubieta's attorney]: Objection. Hearsay.
>     The Court: Overruled.

Only Barroso appeals this issue, and he did not object or join in Ubieta's objection at trial. Accordingly, we review for plain error. *See United States v. Hernandez*, 896 F.2d 513, 523 (11th Cir. 1990).

17

Hearsay is a statement that "the declarant does not make while testifying at the current trial . . . offer[ed] . . . to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801. The government argues that it did not offer the testimony to prove the truth of the matter asserted, i.e., that Perez's father was alive, and therefore the statement was not hearsay. During cross-examination, Perez was questioned extensively about whether she had tried to verify that her father was deceased before signing the papers that resulted in the purchase of the property at 1985 South Ocean Drive. The government maintains that it sought to clarify that Perez did not find out that her father was alive until after she had been duped into purchasing the property.

Barroso argues that there "was no evidence, but for this hearsay as to what the case agent told the government witness to support the premise that Barroso lied about the father's death." As the government has insisted, the evidence was not introduced to show that Perez's father was alive, but to show that she did not know that her father had not left her an inheritance until after she unwittingly purchased a house. Thus, whether there was evidence to support that Perez's father was alive is not at issue. Accordingly, there was no plain error.

**6. Whether Barroso's counsel represented him under a conflict of interest and if so, whether the district court erred by failing to grant a mistrial or otherwise take action.**

18

At trial, during the cross-examination of Diaz, Barroso's attorney introduced a check purportedly signed by Diaz, written to Barroso in the amount of $10,000. Diaz denied signing the check. The check was dated around the same time as the initial wire fraud scheme in 2006, in which Barroso and Diaz were both convicted.

Sometime after Barroso's attorney introduced the check into evidence, the government notified the court and opposing counsel that the check was a forgery because neither bank listed on the check could verify that the check was ever deposited into one account and withdrawn from the other, despite the fact that the check had a processing stamp. Defense counsel later explained that the check was attached to a deposition in a related civil case. The government noted that it had "no doubt that defense counsel was wholly unaware that the document was likely a forgery when they introduced it into evidence." The court noted, "I accept that." The court also noted that it was not placing blame "at [defense counsel's] doorstep or . . . feet or, for that matter even this defendant" but the court was concerned and the government "should follow up and . . . get to the bottom of it."

Barroso now urges us to conclude that these events gave rise to a conflict of interest, and the "district court erred in not declaring a mistrial and severing Mr. Barroso when an actual conflict of interest arose between Mr. Barroso and his appointed counsel." "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict

19

of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980).

"An actual conflict of interest occurs when a lawyer has inconsistent interests." *Freund v. Butterworth*, 165 F.3d 839, 859 (11th Cir. 1999) (internal quotation marks omitted). To prove that an actual conflict hindered defense counsel's performance, Barroso "must make a factual showing of inconsistent interests or point to specific instances in the record to suggest an actual impairment of his or her interests." *Id.* (internal quotation marks omitted. There is no Sixth Amendment violation "because [of] a speculative or merely hypothetical conflict of interest." *United States v. Novaton*, 271 F.3d 968, 1011 (11th Cir. 2001) (internal quotation marks omitted). The district court and the prosecution repeatedly expressed their confidence that defense counsel was unaware of the inauthenticity of the check, and Barroso fails to point to anything in that record to delude our confidence that defense counsel had done nothing wrong. To the extent Barroso implies that a conflict of interest would arise because defense counsel may not have trusted her client after the forged check was introduced, such an argument is speculative and unsupported by the evidence.

Finally, Barroso has not cited any instance where a supposed conflict between him and his attorney adversely affected his attorney's representation. *See Freund*, 165 F.3d at 860 (noting the defendant should identify some "plausible

20

alternative defense strategy or tactic that might have been pursued" (internal quotation marks and alterations omitted)).  Barroso maintains that his attorney failed to further investigate the fraudulent check and did not respond to the government's accusations about the check during closing argument.  Considering the fraudulent nature of the check was unearthed during trial and the likely person responsible for the fraudulent check was Barroso, it is unclear what plausible alternative strategy counsel should have taken.

**7. Whether the district court abused its discretion when it limited each defendant's closing argument to twenty minutes.**

The district court limited Ubieta's and Borroso's closing argument to twenty minutes each, and the government was permitted thirty minutes total.  The defendants requested forty-five minutes each, but the district court denied their requests.  We review the "period of time to be allotted for attorneys' closing arguments" for abuse of discretion.  *United States v. Ransfer*, 749 F.3d 914, 937 (11th Cir. 2014) (internal quotation marks omitted).

Ubieta and Borroso argue that the district court "abused its discretion in limiting [their] closing argument to 20 minutes [each] given the factual and legal complexity [of] the case, the number of testifying witnesses and the quantum of documentary evidence."  This case involved twelve witnesses, eight real estate transactions, and tens of thousands of documents.  However, in *Ransfer*, we held that the district court did not abuse its discretion when it limited closing argument

21

to twenty minutes under similar circumstances. *See id.* The *Ransfer* trial involved three defendants, sixteen counts of Hobbs Act robbery, a conspiracy charge, and a charge of using firearms during the commission of a violent crime, and the trial spanned three days. *Id.* at 918, 920–21. We reasoned that the defendant in *Ransfer* had not presented any arguments that "his attorney was not able to cover in the twenty minutes allotted for his closing argument. Since [he] failed to identify any prejudice to his defense, we [did] not find the limitation was an abuse of discretion." *Id.* at 937. We also cited with approval *United States v. Sotelo*, 97 F.3d 782, 294 (5th Cir. 1996), in which the Fifth Circuit concluded that there was no abuse of discretion when the district court limited closing arguments to ten minutes per defendant, and the case involved a twelve-count indictment and forty witnesses. *See Ransfer*, 749 F.3d at 937. Likewise, Ubieta and Barroso fail to identify any prejudice they suffered from the district court's decision to limit closing argument to twenty minutes.

Ubieta argues that the same judge in *Ransfer* tried this case, and this establishes that twenty minutes was the "judge's default time for closing argument." Even if Ubieta's unsupported accusation is accurate, nothing in the defendants' briefs or record indicates that the limited twenty-minute closing argument window hindered Ubieta or Barroso from making their arguments to the jury.

22

**8. Whether the prosecutor improperly vouched for the government's witnesses during closing argument.**

During closing argument, Barroso's counsel reminded the jury that they had not heard testimony from Kyle Baker and Joel Zaldivar, two codefendants and mortgage brokers who had pleaded guilty earlier in the case. Defense counsel continued:

> Did you hear from Kyle Baker? Did you hear from Joel Zaldivar? There's a reason why you didn't. Because, believe me, if they had told [the prosecutor], if they had told him, yeah, Barroso's the one who brought me these people, Barroso's the one who supplied me with all this information, believe me, ladies and gentlemen, they would have testified. And you know what? They're cooperating with the government. So you know that's not what they would have said. And that's why [the prosecutor] didn't bring them. He wants you to make that leap . . . . [T]hey're cooperating with the government. Do you think they're going to risk their hope for a reduction by helping Mr. Barroso out by telling the truth? These guys were consummate liars.

In response, the government explained:

> First, you heard a lot of talk about Kyle [B]aker and Joel Zaldivar. You heard the defense constantly mention them during the course of the trial in an attempt to say they are the only ones who are the crux of this fraud. These two people were duped. They had nothing to do with it. All the fraud happened at First Class Mortgage. And [defense counsel] questioned why the government didn't call either of those individuals. [Defense counsel] questioned it. [Defense counsel] suggested I was going to say she had the right to call them, too, in response. I'm not. I'm going to point out to you that [defense counsel] said that these guys were consummate liars, and they were. I wasn't going to put the consummate liars on the stand.
> [Defense counsel]: Objection, Objection. Self-serving. Is not evidence.
> The Court: Overruled.

[The prosecutor]:  I wasn't going to put the two people she's described as the consummate liars on the stand and ask you to believe them.  I wasn't going to tie the credibility of the United States of America to them.
[Defense counsel]: Can I have a standing objection to this whole line of argument, Judge?
The Court: All right.
[Defense counsel]: I would join in that.
The court: All right.

Barroso argues the district court erred because this amounted to "impermissible vouching by the government, and reliance on extra-record evidence, [which] was highly improper and unduly prejudicial."  Essentially, Barroso claims that the government engaged in backdoor vouching for its witnesses.  That is, since the government told the jury that it would not call individuals that the defense attorneys had dubbed "consummate liars," the government implied that it only called truthful witnesses. Further, Barroso maintains that this behavior also suggested the existence of additional evidence not formally before the jury.  We review claims of prosecutorial misconduct de novo. *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006).

"A prosecutor's remarks are improper if they attempt to bolster the credibility of a witness based on the government's reputation or through alluding to evidence not admitted at trial."  *United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009).  The question is whether the prosecutor was merely arguing credibility, which is permissible, or whether he was arguing credibility based on

24

the reputation of the government office or on evidence not before the jury. *Id*. Additionally, we have "recognized an exception to this prohibition, the so-called fair response rule, that entitles a prosecutor to respond to arguments advanced by defense counsel in his or her statement to the jury." *Id.* (internal quotation marks omitted).

The prosecutor's statements during closing argument were not improper, and to the extent the remarks pushed the envelope of propriety, the remarks constituted "a fair response to the defense counsel[s'] comments." *See United States v. Smith*, 700 F.2d 627, 634 (11th Cir. 1983) (internal quotation marks omitted). First, the prosecutor did not "attempt to bolster the credibility of" any witness who testified at trial; the comments in question related to non-testifying witnesses. *See Lopez*, 590 F.3d at 1256. Barroso's back door vouching argument also misses the mark. Just because the government indicated that it did not want to call witnesses that defense counsel had labeled "consummate liars" does not mean that all the witnesses that the government did call were consummate truth tellers.

Moreover, the majority of the prosecutor's statements indicated that the prosecutor himself did not believe that the non-testifying witnesses were credible. The prosecutor's statement that, "I wasn't going to tie the credibility of the United States of America to them," comes closer to being improper. However, this statement was "a fair response" to defense counsel's statements. After all, the

25

defendants suggested that the prosecutor did not call these witnesses because he wanted to ensure that the jury placed blame at Barroso's feet. Defense counsel also suggested that the government did not call the witnesses because the government knew that the witnesses would lie on the stand to try to help themselves, even though the truth would help Barroso. In short, the prosecutor was allowed to respond to the defendants' arguments, and nothing the prosecutor said during closing argument was improper.

**9. Whether the district court abused its discretion when it denied both defendants' requests for a good faith jury instruction.**

The defendants requested that the district court include a good faith jury instruction, which the district court denied. The defendants requested the following jury instruction, taken largely from the Eleventh Circuit Pattern Jury Instruction:

> "Good-faith" is a complete defense to a charge that requires intent to defraud. A defendant isn't required to prove good faith. The Government must prove intent to defraud beyond a reasonable doubt. An honestly held opinion or an honestly formed belief cannot be fraudulent intent—even if the opinion or belief is mistaken. This is so even if the defendant's belief was not objectively reasonable as long as he held the belief in good faith. Similarly, evidence of a mistake in judgment, an error in management, or carelessness can't establish fraudulent intent.

> But an honest belief that a business venture would ultimately succeed doesn't constitute good faith if the Defendant intended to deceive others by making representations the Defendant knew to be false or fraudulent.

*See* 11th Cir. Pattern Jury Instruction No. 17 (2010).

We review a district court's decision not to give a requested jury instruction for abuse of discretion. *United States v. Maxwell*, 579 F.3d 1282, 1303 (11th Cir. 2009). A district court abuses its discretion if:

> (1) the instruction is correct; (2) the court did not address the substance of the instruction in its charge; and (3) the failure to give the instruction seriously impaired the defendant's ability to present an effective defense. A defendant is entitled to a specific instruction on his theory of defense, not an abstract or general one.

*United States v. Sirang*, 70 F.3d 588, 593 (11th Cir. 1995) (internal citation omitted).

The government concedes that the proposed instruction was a correct statement of the law. As to the second element, we have previously recognized that because the district court gave a detailed explanation of intent, "[t]he court's instruction to the jury on intent to defraud adequately addressed the concept of good faith. So, the jury essentially considered the defense of good faith and rejected it when it found defendants guilty." *United States v. Walker*, 26 F.3d 108, 110 (11th Cir. 1994) (per curiam). Similarly, the district court instructed the jury that Ubieta and Barroso had to act with "the *intent to defraud*," which required "the *specific intent* to *deceive* or *cheat* someone, usually for personal financial gain or to cause financial loss to someone else." Concerning the conspiracy charge, the district court cautioned that in order to find a defendant guilty, the jury must find

27

that "the defendant knew of the unlawful purpose of the plan and *willfully* joined it," which required the defendant to act "*voluntarily and purposefully with the intent* to do something the law forbids; that is, with the *bad purpose* to *disobey* or *disregard* the law." Accordingly, the jury instructions encompassed the substance of the good faith instruction because the instructions emphasized intent and the government's burden.

Finally, the defendants have not shown how the failure to give the good faith instruction seriously impaired their ability to present an effective defense, which is generally required to show that the district court abused its discretion. *See Sirang*, 70 F.3d at 593. Ubieta and Barroso argued, albeit unsuccessfully, that they had no intent to defraud. Although they were involved in various transactions, they argued that they did not intend to commit wire fraud, and thus, the failure to give the good faith instruction did not inhibit the defendants from arguing the substance of the good faith instruction. The defendants presented their theory, and the jury rejected it. The district court did not abuse its discretion.

**10. Whether a constructive amendment of the indictment occurred at trial.**

The indictment alleged that Diaz "acted as a straw buyer who allowed his identity and credit to be used in the purchase of 185 SW 7th Street." At trial, Diaz testified that, although he had pleaded guilty to wire fraud resulting from a purchase of a home in 2006, a case in which Barroso also pleaded guilty, he knew

28

nothing about the purchase of the property purchased in his name at 185 SW 7th Street, which occurred the following year. The government's theory at trial was that Barroso used Diaz's personal information without Diaz's consent to purchase the property at 185 SW 7th Street. Barroso argues that change amounted to constructive amendment of the indictment.

> We have noted:
>
> Two types of problems can arise as a result of a trial court's deviation from an indictment. *When a defendant is convicted of charges not included in the indictment, an amendment of the indictment has occurred.* If, however, *the evidence produced at trial differs from what is alleged in the indictment, then a variance has occurred.* The distinction between an amendment and a variance is important in that an amendment is *per se* reversible error, while a variance requires the defendant to show that his rights were substantially prejudiced by the variance in order to be entitled to a reversal.

*United States v. Keller*, 916 F.2d 628, 633 (11th Cir. 1990) (emphasis added). "A constructive amendment to the indictment occurs where the jury instructions so modify the elements of the offense charged that the defendant may have been convicted on a ground not alleged by the grand jury's indictment." *United States v. Sanders*, 668 F.3d 1298, 1309 (11th Cir. 2012) (quoting *United States v. Starke*, 62 F.3d 1374, 1380 (11th Cir. 1995)). Barroso does not argue that the jury instructions modified the elements of the offenses charged. Although an "indictment may [also] be amended as a result of . . . a prosecutor's statements," *United States v. Castro*, 89 F.3d 1443, 1453 (11th Cir. 1996), a constructive

29

amendment occurs only "when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment," *Keller*, 916 F.2d at 634. Regardless of whether Diaz was a consenting straw buyer who agreed to purchase the property at 185 SW 7th Street—as alleged in the indictment—or a victim of identity theft—as he and the government argued at trial—the essential elements of wire fraud and conspiracy were unchanged. Accordingly, there was no constructive amendment and no error.

To the extent Barroso unwittingly raises a variance argument, his claim also fails. A variance "occurs when the facts proved at trial deviate from the facts contained in the indictment but the essential elements of the offense are the same." *Id.* However, to prove reversible error from a variance, Barroso must "show that his rights were substantially prejudiced by the variance." *Id.* at 633. Barroso has not argued that any prejudice resulted from the change in facts in the indictment from those presented at trial.

**11. Whether the district court abused its discretion when it denied Barroso's motions for expert assistance, trial transcripts, and a continuance of his sentencing hearing.**

Prior to sentencing, the government requested that the probation office apply an identity theft enhancement, pursuant to USSG § 2B1.1(b)(11)(C)(i), when calculating Barroso's Guidelines range. The basis of the enhancement was that

30

Barroso used Diaz's social security card and driver's license to purchase the property located at 185 SW 7th Street without Diaz's knowledge. The evidence at trial showed that Diaz's social security card had not been signed when it was used in the 2006 transaction, but the copy used to purchase the 185 SW 7th Street property was signed.[2]

The probation office also recommended imposing an obstruction of justice enhancement, pursuant to USSG § 3C1.1, based on the introduction of the fraudulent check into evidence at trial. This fraudulent nature of the check was based on the government's discovery that neither bank listed on the check could verify that it was deposited or withdrawn from any account.

In reaction to the probation office's recommendations, Barroso requested $1,600 to hire a handwriting expert that could verify whether the signature on the check and social security card belonged to Diaz. Barroso also requested costs for the trial transcripts. Additionally, he requested a thirty-day continuance of the sentencing hearing. The district court denied his requests.

We review the district court's decision to deny an indigent defendant's application for funding and its decision to deny a motion to continue sentencing under the abuse of discretion standard. *United States v. Hernandez*, 743 F.3d 812, 814 (11th Cir. 2014) (per curiam); *Valladares*, 544 F.3d at 1261.

---

[2] The evidence at trial also showed that Diaz's social security card, not the copy, remained unsigned.

31

The district court did not err when it denied Barroso funds to retain a handwriting expert and trial transcripts. Even if the signature on the fraudulent check matched Diaz's signature, it would not save Barroso from the identity-theft enhancement. This is so because Diaz testified he did not authorize Barroso to use his identity to purchase the property at 185 SW 7th Street. Even if the signature belonged to Diaz (or was a copy of his signature), the court could still believe Diaz's testimony—that Barroso used it without his permission. The identity theft enhancement can apply when "[a] defendant obtains an individual's name and social security number from a source . . . and obtains a bank loan in that individual's name." USSG § 2B1.1 cmt. n.9(C)(ii)(I) (2012).[3]

Similarly, Barroso argues that the handwriting expert was necessary to address the applicability of the obstruction of justice enhancement. The obstruction of justice enhancement can apply when a defendant "produc[es] . . . a false, altered, or counterfeit document or record during a[] . . . judicial proceeding." USSG § 3C1.1 cmt. n.4(C). On cross-examination of Diaz, Barroso introduced into evidence a $10,000 check, purportedly signed by Diaz and endorsed by Barroso. The banks listed on the stamp of the check confirmed that the check did not correspond to any transaction, despite the fact that the stamp indicated the check had been processed. Regardless of whether Diaz's signature

---

[3] As of November 1, 2013, note 9 was renumbered to note 10.

32

was authentic, the check itself was forged and Barroso introduced it at trial, warranting the enhancement.

With regard to both the requests for transcripts and that the court continue sentencing, Barroso has not shown he was prejudiced by the denial of those requests. *See Valladares*, 544 F.3d at 1265 (affirming the denial of a continuance because the defendant did not identify "any specific documents or other non-cumulative evidence that would indicate a different outcome if [the] motion[] had been granted"). Barroso has not identified how he could have benefited at sentencing based on receiving a continuance or the trial transcripts. Instead, he continues to reiterate the need to "demonstrate that Diaz's signature on the relevant documents concerning the S.W. 7th Street transaction were not forgeries nor was his signature on the $10,000 check," but regardless, the jury and the district court believed Diaz when he said he did not authorize the transaction.

Finally, Barroso again alleges error arising from whether Diaz was acting as a straw buyer (as was alleged in the indictment) or whether he was a victim of identity theft (as was presented at trial) during the purchase of the 185 SW 7th Street property. He contends that he was deprived of his Fifth Amendment due process rights when the government based its case and sentencing on these "inconsistent theories." Barroso raised this argument in issue ten, and we have rejected his argument there. Barroso has not alleged the type of "essential"

33

inconsistency that would support a Fifth Amendment claim because the

inconsistencies he points to did not affect the elements of the charged offenses.

*See United States v. Dickerson*, 248 F.3d 1036, 1043–44 (11th Cir. 2001).

**12. Whether the district court committed procedural error when it calculated each defendant's advisory Guidelines range.**

The district court calculated Barroso's advisory Guidelines range to be 210

to 262 months, with an offense level of thirty-six and a criminal history category of

II. It calculated Ubieta's Guidelines range to be 210 to 262 months, with an

offense level of thirty-seven and a criminal history category of I. Barroso and

Ubieta raise a number of alleged procedural errors as to these calculations.

**A. Loss Amount**

Pursuant to USSG § 2B1.1.(b), the district court was charged with

determining the loss amount associated with each defendant's offenses. The

Guidelines "require only a reasonable estimate of loss." *United States v.*

*Barrington*, 648 F.3d 1178, 1198 (11th Cir. 2011). Here, the losses equaled the

amount the lenders suffered after the straw buyers defaulted on their mortgages.

The losses were offset by "the amount the victim has recovered at the time of

sentencing from disposition of the collateral," here the amount the lenders

recovered after selling the properties. USSG § 2B1.1 cmt. n.3(E)(ii). Under

USSG § 2B1.1, the enhancement level is tied to the loss amount attributable to the

offense.

34

### i. Barroso

The probation office held Barroso accountable for $5.26 million in losses, which yielded an eighteen-level increase to his offense level under USSG § 2B1.1(b)(1).  Any loss that exceeds $2.5 million up to and including $7 million triggers an eighteen-level increase.  *Id.*  Barroso argues on appeal that the "government failed to show a loss amount exceeding $2,500,000."  He first argues that the loss amount was overstated because the bank demolished one of the homes on a property involved in the conspiracy, which caused the offset value of the property to be lower than it would have been with the home intact.  However, the district court accounted for this problem, and the change in Barroso's loss amount did not affect his increase under USSG § 2B1.1.  Barroso also argues that the government's methods of calculation were unreliable, but he cites nothing in support of this argument.  The court established the outstanding value of each loan and offset that value by proceeds recovered by the lender upon the resale of each property.

### ii. Ubieta

The government calculated $8,188,676.13 in losses attributable to Ubieta's criminal offenses.  Under USSG § 2B1.1, any loss greater than $7 million but less than $20 million results in a twenty-level increase.  The court reduced the government's loss calculation by $276,000 due to the fact that one of the banks

demolished a home on a piece of property and sold the property for land value only. This resulted in a loss calculation of $7,912,676.13. Ubieta argues other errors occurred that, if corrected, would push the loss figure below $7 million and would therefore yield a eighteen-level increase, rather than the twenty-level increase that he received.

Ubieta first argues that the loss amount attributable to him is flawed because Citi Mortgage sold a property located at Alesio Avenue for less money than it could have, rendering an artificially low offset value with regard to that property. Citi Mortgage sold the property at Alesio Avenue for $243,200. Three months later, the Alesio Avenue property sold for $420,000. Ubieta urges us to reduce the loss attributable to him by $176,800, the difference between Citi Mortgage's sale of the property and the price the property brought three months later. When collateral is involved, the Guidelines provide that loss amounts should be offset by "the amount the victim has recovered at the time of sentencing from disposition of the collateral." USSG § 2B1.1 cmt. n.3(E)(ii). Ubieta fails to explain why the district court should not have followed the general rule. He has not argued that Citi Mortgage acted in bad faith, nor has he provided any information relating to the subsequent sale. Accordingly, the district court did not err.

Ubieta also argues that the district court erred when it included losses on two properties—one on 3740 Charles Terrace and another on 227 Jefferson Drive.

36

According to Ubieta, the government's theory at trial was that Ubieta was primarily involved in the conspiracy by prematurely releasing closing funds so that the straw buyer or co-conspirators could use those funds to make cash-to-close payments on the properties and by issuing title commitments falsely stating that the sellers owned the property as of the date of the sale when they did not.  He argues that because he did not play either of those roles in the purchase of the properties at Charles Terrace and Jefferson Drive, the losses should not be attributable to him.

However, in conspiracy cases, the defendant's Guidelines range is based on "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity . . . ."  USSG § 1B1.3(a)(1)(B).   Here, the district court concluded that the Charles Terrace and Jefferson Drive properties involved "conduct that was reasonably foreseeable as part of the conspiracy and therefore those amounts should be included for calculating the amount of loss." We review that decision for clear error.  *See United States v. Valarezo-Orobio*, 635 F.3d 1261, 1264 (11th Cir. 2011).

The district court's decision was not clearly erroneous.  A straw buyer was used to purchase the Charles Terrace property, and Ubieta released $135,150 in loan proceeds to a company involved with another co-conspirator.  A straw buyer also purchased the Jefferson Drive property, and Ubieta prepared the HUD-1 Settlement that overstated the amount the sellers actually received.  The banks

37

suffered losses on both properties.  Regardless of the exact role Ubieta played, the loss was reasonably foreseeable.

Ubieta encourages us to conclude that the district court erred in two other respects—by including taxes and insurance amounts in the loss calculation and by overstating a loss amount to a property located at Leonardo Street.  The total amount of losses in taxes and insurance was $238,672.26.  Ubieta argues that the loss calculation overstated the bank's loss on the Leonardo Street property by $561,000.00.[4]  Assuming without deciding that it was error to include these losses, the total loss attributed to Ubieta would still exceed the seven million dollar threshold to trigger the twenty-level increase the district court applied.

## B. Identity Theft Enhancement

Section 2B1.1(b)(11)(C)(i) of the Guidelines authorizes a two-level enhancement where the offense involved "the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification . . . ."  Based on the evidence presented at trial, the district court concluded that the defendants used Diaz's identification without his permission for the purchase of 185 SW 7th Street, and therefore, the identity theft enhancement applied.  We review "purely legal questions de novo . . . and factual findings for

---

[4] Combining these losses yields a total of $799,672.26.  Subtracting that amount from the total loss amount applied to Ubieta ($7,912,676.13) equals $7,113,003.87, still well over the seven million dollar threshold.

clear error, and in most cases, a district court's application of the guidelines to the facts with due deference." *United States v. Rothenberg*, 610 F.3d 621, 624 (11th Cir. 2010).

### i. Barroso

First, Barroso argues that because Diaz and Barroso were convicted of wire fraud in 2006, Diaz somehow joined a broader conspiracy and, therefore, he consented to the use of his identity in 2007. However, Diaz testified at trial that he did not authorize the use of his identity in the 2007 transaction. The government also introduced Diaz's unsigned, original social security card. The purchaser of the property of 185 SW 7th Street used a signed copy of Diaz's social security card, lending credence to Diaz's testimony. Moreover, Diaz was never indicted in the present case.

Barroso next argues that the use of Diaz's information to obtain a bank loan does not constitute "the unauthorized transfer or use of any means of identification unlawfully to produce or obtain other means of identification" to trigger the enhancement under USSG § 2B1.1(b)(11)(C)(i). However, "the account number of the bank loan is the other means of identification that [was] obtained unlawfully." USSG § 2B1.1 cmt. n.9(C)(ii)(I) (2012); *see also United States v. Williams*, 355 F.3d 893, 899–900 (6th Cir. 2003).

### ii. Ubieta

According to Ubieta, because the evidence from trial suggested that Barroso used Diaz's information from the 2006 transaction to obtain a bank loan in 2007, only Barroso should receive the identity theft enhancement.  However, Ubieta's role in the Diaz transaction was extensive, and the district court did not err in applying the identity theft enhancement.

Most notably, the government presented evidence at trial that Ubieta used personal funds to satisfy Diaz's cash-to-close payment.  Further, the government presented evidence that Ubieta instructed another codefendant to wire loan proceeds back to Two B and to Ubieta via his mother-in-law's account.  Ubieta also signed false title commitment letters.  This evidence establishes that Ubieta likely knew that Diaz's identity was used without Diaz's consent to obtain the mortgage loan, but even assuming Ubieta was unaware of the exact nature of the identity theft, it was reasonably foreseeable that a co-conspirator, here Barroso, would unlawfully obtain and use Diaz's identity to further the conspiracy.  *See* USSG § 1B1.3(a)(1)(B).  Accordingly, there was no error.

40

## C. Role Enhancements

At the sentencing hearing, the district court applied a role enhancement to both Barroso and Ubieta. Because the application of a leadership enhancement is a factual finding, we review for clear error. *See United States v. Barrington*, 648 F.3d 1178, 1200 (11th Cir. 2011).

### i. Barroso

The district court concluded Barroso "was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants," which resulted in a three-level increase under USSG § 3B1.1(b). Barroso maintains that because the individuals he recruited were not "criminal participants," the district court erred by applying the enhancement.

Although the evidence presented at trial established that Barroso manipulated straw buyers or simply used the straw buyer's identity—rendering those straw buyers non-participants in the conspiracy— the evidence also showed that he managed two or three other participants in the conspiracy. A "defendant need only manage or supervise one other participant for the enhancement to apply." *United States v. Zepeta*, 389 F. App'x 907, 909 (11th Cir. 2010) (per curiam). Here, the district court could reasonably conclude that Barroso supervised his wife, his mother-in-law, and an unidentified woman whom he paid to provide a false verification of employment during the Perez transaction. After

41

all, Barroso's mother-in-law served as a straw buyer on one of the properties, and Barroso's company, Two B, received a portion of the loan proceeds from that deal. Barroso's wife also participated by diverting loan proceeds to satisfy the straw buyer's cash-to-close payment.

### ii. Ubieta

The district court concluded that Ubieta was "an organizer or leader of criminal activity," which resulted in a four-level increase under USSG § 3B1.1(a). Ubieta argues that the district court misapplied the factors courts should consider under USSG § 3B1.1. The factors the court should consider "include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." USSG § 3B1.1 cmt. n.4; *see also United States v. Martinez*, 584 F.3d 1022, 1026 (11th Cir. 2009).

The district court did not err when it concluded that Ubieta was a leader or organizer of the enterprise. Ubieta acted as the closing agent on all of the properties identified in the superseding indictment. Moreover, he repeatedly released the lenders' proceeds prior to receiving the buyer's cash-to-close payments, and the co-conspirators used those funds to satisfy the straw buyer's

cash-to-close payments. Thus, his participation in the offense was significant and without it, the scope of the fraud would have been narrower. The government established at trial that Ubieta exercised control over codefendant William Hartnett by repeatedly giving him instructions without any explanation, which Hartnett obeyed. Given how integral Ubieta's involvement was to the conspiracy's success, Ubieta's arguments—that he neither recruited accomplices nor claimed a large share of the profits—does not render the application of the leadership enhancement clear error. Moreover, Ubieta's argument that other codefendants received more money from the fraud and maintained decision-making authority, does not save him from the enhancement. "There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." USSG § 3B1.1 cmt. n. 4.

### D. Barroso's Remaining Claims

### i. Sophisticated Means

The district court applied a two-level enhancement because Barroso's offense "involved sophisticated means." USSG § 2B1.1(b)(10)(C). We have affirmed the application of the sophisticated means enhancement under very similar circumstances. *See United States v. Rodriguez*, 751 F.3d 1244, 1258 (11th Cir. 2014) (affirming the enhancement when the defendant "participated in a scheme that utilized straw buyers, fraudulent mortgage documents, fake title

corporations, as well as the improper diversion of the U.S. mail"). Barroso recruited and duped straw buyers, received early release funds, and used those funds to make the straw buyer's cash-to-close payments; the scheme involved false mortgage loan applications and other fraudulent mortgage documents. We therefore uphold the district court's sophisticated means enhancement.

### ii. Gross Receipts

The district court imposed a two-level enhancement because Barroso "derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense." USSG § 2B1.1(b)(15)(A) (2012). The funds Barroso received were funneled primarily through his company, Two B. On appeal, Barroso correctly states the law; the Guidelines only contemplate the funds Barroso individually received, not the funds he jointly obtained with co-conspirators. *See* USSG § 2B1.1 cmt n.11(A) (2012). He claims for the first time on appeal that his wife was a co-owner of Two B, and therefore, the district court should not have applied the gross receipts enhancement based on the money funneled through Two B. However, Barroso failed to object to the presentence investigation report, which specifically identifies Barroso as "the sole owner of Two B Investments Group." "Without objection and in the absence of manifest injustice," we treat conclusions contained in a presentence investigation report as binding. *United States v. Norris*, 50 F.3d 959, 962 (11th Cir. 1995). Moreover,

44

Barroso has pointed to no evidence in the record that would establish that Barroso and his wife jointly owned Two B. Accordingly, there was no clear error or manifest injustice.

### iii. Obstruction of Justice

The Guidelines impose a two-level enhancement for obstructing justice during the "prosecution . . . of the instant offense of conviction . . . ." USSG § 3C1.1. The district court applied this enhancement to Barroso based on defense counsel's introduction of the fraudulent check at trial to impeach Diaz. We review for clear error. *United States v. Williams*, 627 F.3d 839, 844 (11th Cir. 2010).

Barroso argues that the government failed to present any evidence connecting him—as opposed to his attorneys alone—to the introduction of the forged check. However, the district court reasonably inferred that Barroso, rather than his attorneys alone, introduced the check at trial. Barroso's signature appears on the endorsement line of the check, and he has never disputed the authenticity of his signature. Moreover, the check first emerged in a civil suit brought by the lender against Diaz. According to Diaz's testimony, Barroso arrived unexpectedly at Barroso's workplace and escorted Diaz to the civil deposition, during which the check was introduced. Barroso also had hired a lawyer to represent Diaz. Barroso's involvement in the civil suit, to which he was not a party, is also probative of his knowledge of the check. Finally, the check's relevance on its face

45

was not obvious, as it simply was written from Diaz to Barroso in the amount of $10,000. Without any input from Barroso, it is almost incomprehensible why Barroso's attorneys would have introduced the check at trial. Therefore, the district court did not clearly err.

### iv. Criminal History Score

The Guidelines assign points to any "prior sentence" imposed on a defendant, and based on the total number of points a defendant has, he is placed into one of six criminal history categories. *See* USSG § 4A1.1. Here, based on Barroso's 2006 conviction in which he and Diaz pleaded guilty to wire fraud and conspiracy to commit wire fraud, the probation office determined that Barroso should have a criminal history category of II. Barroso objected, but the district court overruled his objection.

Barroso argues that his 2006 conviction was "part of the instant offense," and therefore should not have been included in determining his criminal history category. *See* USSG § 4A1.2(a)(1). The district court properly included Barroso's 2006 "prior sentence" in calculating Barroso's criminal history category. USSG §§ 4A1.1 & 4A1.2. "The term 'prior sentence' means any sentence previously imposed upon adjudication of guilt . . . for conduct not part of the instant offense." USSG § 4A1.2(a)(1). To determine whether Barroso's 2006 sentence was "part of the instant offense," we look at USSG § 1B1.3. *See* USSG § 4A1.2 cmt. n.1.

Conduct is part of the instant office when it "occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." USSG § 1B1.3(a)(1).

Here, the conduct underlying Barroso's first conviction occurred in 2006, but the conduct in the instant case occurred between 2007 and 2008. Moreover, the only common actor in both offenses was Barroso. Finally, the instant conspiracy was much broader in degree and scope than the 2006 transaction. The 2006 transaction did not involve stolen identities, the premature release of loan proceeds, or the issuance of false title commitments, as was the case here. Accordingly, the district court did not err.

Barroso also argues that the district court erred when it declined to give him a downward departure, but we lack jurisdiction to review the court's decision on that issue. *See United States v. Winingear*, 422 F.3d 1241, 1245 (11th Cir. 2005) (per curiam).

### E. Abuse of Position of Trust Regarding Ubieta

Ubieta "has abandoned this issue by failing to develop any argument in his opening brief." *United States v. Woods*, 684 F.3d 1045, 1064 n.23 (11th Cir. 2012) (per curiam). His one-sentence, conclusory statement that the "enhancement for abuse of position of trust pursuant to [USSG] § 3B1.3 was not factually supported

47

by the record and improper as a matter of law" provides us with no guidance, and we decline to manufacture arguments on his behalf.

**13. Whether the defendants' sentences are substantively unreasonable.**

The defendants next challenge their sentences as substantively unreasonable. The court sentenced Barroso to 210 months, the bottom of his Guidelines range, and it sentenced Ubieta to 240 months, a sentence in the middle of his Guidelines range. We review the substantive reasonableness of a sentence for abuse of discretion. *United States v. Thompson*, 702 F.3d 604, 606–07 (11th Cir. 2012). "Although we do not automatically presume a sentence within the guidelines range is reasonable, we ordinarily expect such a sentence to be reasonable." *United States v. Perkins*, 787 F.3d 1329, 1342 (11th Cir. 2015) (citing *United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008)).

**A. Barroso**

Barroso does not truly make a substantive reasonableness argument and to the extent he does, it is linked to his criminal history category, which we have addressed and rejected. Moreover, the district court adequately addressed the factors and considered the totality of the circumstances. Therefore, the district court did not err by declining to vary below the Guidelines range.

**B. Ubieta**

48

Ubieta argues that the court failed to properly apply the factors under 18 U.S.C. § 3553(a) and, as a result, his sentence was substantively unreasonable. We disagree. As the district court reasoned, Ubieta "expressed no remorse for his criminal behavior, and has admitted to no wrongdoing." The district court also cited the sophistication of the offense, the extended period of time the crimes occurred, and the large number of people involved in order to make the conspiracy successful. The district further noted the importance of deterrence, reasoning that probation would not deter "would-be-white-collar criminal[s]."

Ubieta maintains that the district court glossed over his charitable contributions and good deeds that positively impacted his community. However, the district court properly declined to give a downward variance because the evidence at trial showed that Ubieta was a crucial part of a widespread fraud that impacted multiple victims. Ubieta's other argument—that the court overstated his role in the fraud—is not demonstrated in the record and is, therefore, without merit.

Ubieta also argues that the "sentence imposed . . . created an unwarranted disparity between Mr. Ubieta's sentence and the sentence the district court imposed on other individuals with similar records and convicted of the same or similar conduct in this case." Specifically, he maintains that the sentences of two mortgage brokers—who received forty-eight months and seventy-eight months

49

respectively—generated this disparity. However, Ubieta was the title agent and never accepted responsibility, even after trial. Accordingly, "there is no unwarranted disparity when a cooperating defendant pleads guilty and receives a lesser sentence than a defendant who proceeds to trial." *United States v. Mateos*, 623 F.3d 1350, 1367 (11th Cir. 2010) (quoting *United States v. Langston*, 590 F.3d 1226, 1237 (11th Cir. 2009)).

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgments of the district court.